## VI

**In re J.G. Jr. G.T.G., Appellant.**

**No. 02–FS–131.**

District of Columbia Court of Appeals.

Argued Dec. 18, 2002.

Decided Sept. 18, 2003.

---

Robert H. Hollander, Bethesda, MD, appointed by the court, for appellant.

Alan Solomon for appellee.

Arabella W. Teal, Interim Corporation Counsel, Charles L. Reischel, Deputy Corporation Counsel at the time the statement was filed, and Sheila Kaplan, Assistant Corporation Counsel, filed a statement in lieu of brief for the District of Columbia.

Before WAGNER, Chief Judge, and SCHWELB and FARRELL, Associate Judges.

SCHWELB, Associate Judge:

G.T.G., the biological mother of J.G. Jr., born on February 1, 1997, appeals from a final decree of adoption of J.G. Jr. by S.M.T., J.G. Jr.'s maternal great-aunt. The mother contends that the trial judge erred by permitting the adoption over her objection and by finding that a waiver of the statutory consent requirement, *see* D.C.Code § 16–304(e) (2001), was in the best interest of the child. We affirm.

## I.

### THE FACTS

A. *The neglect proceedings.*

J.G. Jr. began his life in unfortunate and shameful circumstances. His first few months were spent in a dirty and unkempt home, with clothes piled in the bathtub and dirty baby bottles and dirty dishes in the sink. The judge who presided over a child neglect proceeding involving J.G. Jr. (Bay-

ly, J.) found the conditions in which the boy lived to be "deplorable." More significantly, J.G. Jr.'s treatment in these conditions was even more deplorable.

On September 22, 1997, when he was less than eight months old, J.G. Jr. was brought to a hospital emergency room because he was choking. The boy was wearing a soaked and soiled diaper. His weight was that of a two-month-old baby.[1] A medical examination revealed, and the neglect judge found, that J.G. Jr. had suffered numerous grave injuries, including multiple rib fractures, several broken bones, subdural bleeding and hemorrhage of the brain, a retinal hemorrhage, a swollen ankle, scratches near his nose, and a bruise on his head. The authorities were promptly notified, and the Office of Corporation Counsel instituted a neglect proceeding in which both parents were accused of abusing their young son.

At the time that J.G. Jr. was brought to the hospital, his biological father, J.G. Sr. was living with the boy's mother, but the two parents were not then married. The mother and the father gave conflicting explanations of their son's injuries. The mother, who at that time was nineteen years of age, admitted to a third party that she sometimes shook her son when she was frustrated with him; the mother also claimed that the boy fell off a couch while he was in his father's care. The father asserted that J.G. Jr. fell off a swing prior to his admission to the hospital. After hearing expert medical testimony, the neglect judge found that "none of [J.G. Jr.'s] injuries could have been inflicted by falling off a couch or a swing," and that the boy's parents had failed to provide an adequate explanation for his injuries. The judge

concluded that J.G. Jr. had received "negligent treatment and maltreatment" from his parents, that the boy was an abused and neglected child, and that his younger brother was in "imminent danger of abuse." At disposition on May 28, 1998, J.G. Jr. was placed in the legal custody of his maternal great-aunt, with whom he had been living since September 1997.

### B. The petition for adoption.

Unfortunately, the record is quite sparse regarding the course of the neglect proceedings after the trial court's initial disposition.[2] If the mother made any attempt to regain custody, there is no evidence in the record of any such attempt on her part, and the evidence strongly suggests that no effort to reunify the family was made by the mother. On September 28, 2000, the great-aunt filed a petition to adopt J.G. Jr. Both the father and the mother refused to consent to the proposed adoption. On August 26, 2001, the judge presiding over the adoption proceedings (Burnett, J.) issued an order directing each parent to show cause why his or her consent to the proposed adoption should not be waived. Judge Burnett scheduled an evidentiary hearing to determine whether such cause existed.

### C. The evidentiary hearing.

The evidentiary hearing before Judge Burnett was held on December 11, 2001. Considering the gravity of the issues, the evidence presented at the hearing was less than exhaustive. For example, although J.G. Jr.'s mother had four living children and was eight months pregnant with a

---

1. J.G. Jr., had been born prematurely. In July 1997, when he was five months old, J.G. Jr. had been admitted to Children's Hospital for "failure to thrive."

2. At the hearing before Judge Burnett, J.G. Jr.'s father testified that the stated goal in the neglect case was adoption and that Judge Bayly had so stated.

fifth,[3] no testimony was adduced or information provided with respect to the circumstances or whereabouts of J.G. Jr.'s siblings. Indeed, the record consists primarily of Judge Bayly's findings of fact in the neglect proceeding and the testimony before Judge Burnett of the great-aunt, the mother, and the father.[4]

The great-aunt testified in support of her petition. She told the court that neither the mother nor the father had ever provided her with any financial support for J.G. Jr. She had suggested that the mother at least bring her son a teddy bear, but the mother had not done so, nor had the mother ever sent a card for the boy's birthday or for Thanksgiving or Christmas.

According to the great-aunt, the mother visited J.G. Jr. regularly until the boy was about two years old. The great-aunt testified that the two women got along well at the time J.G. Jr. was placed with her. The relationship deteriorated when the great-aunt determined that the mother was living with J.G. Sr., the father of J.G. Jr., and the mother's other children; that the mother was being abused by or fighting with the father; and that the police had on one occasion placed the mother under arrest. The great-aunt also testified that the mother had become pregnant several times during the period that J.G. Jr. lived

with the great-aunt, that the pregnancies had interfered with the mother's visitation, and that, while pregnant, the mother had not even telephoned her son; instead, seeking to promote a relationship between J.G. Jr. and his mother, the great-aunt occasionally called the mother on the boy's behalf. The great-aunt acknowledged on cross-examination, however, that the mother and son "have a good relationship," that J.G. Jr. "loves his mother," and that the mother "also loves [J.G. Jr.]."

The mother testified on her own behalf in opposition to the proposed adoption. She asserted that her failure at times to visit her son was due to serious complications with her pregnancies.[5] The mother described her living arrangements over the past years; at one time, she had a place of her own, but it was overcrowded and "not fit,"[6] so she moved to a shelter; at the time of the hearing, she was living with her godmother, but she claimed to be on the waiting list to receive Section 8 public housing.[7] On direct examination, the mother testified as follows:

Q. Are you able to provide a home today to J.?

A. Not really.

She attributed her inability to care for J.G. Jr. to her housing situation.

---

3. A sixth and seventh child had died in infancy.

4. Counsel for the great-aunt first called Donita King, one of several Catholic Charities social workers who worked with J.G. Jr. Ms. King had no knowledge of the case prior to her taking it over in June or July 2000. Ms. King testified, *inter alia,* that neither parent had provided financial support for the child, but this is undisputed. Ms. King acknowledged that the mother was eager to visit J.G. Jr., and pressed Ms. King to make the arrangements for her to do so.

5. The mother also stated that in February 2000, a social worker told her not to visit J.G.

Jr. because of some kind of incident that occurred on the boy's birthday. Partly because of a deficient transcript of the tape-recorded hearing, the nature of this incident is unclear.

6. This "unfit" apartment was apparently the one in which J.G. Jr. lived for the first few months of his life, and which the neglect judge found to be in "deplorable" condition.

7. The mother stated that she had also lived with her grandparents and at the House of Ruth.

The mother also testified that she had been employed during part of the period since J.G. Jr.'s birth, and that she had saved some money for her children. She stated, however, that she had not placed this money in a bank account, but had it in a "safe place," the location of which she was reluctant to disclose.[8] The mother indicated that at one time, she had saved as much as $600.00,[9] but that this amount had been depleted to $480.00 at the time of her testimony. She acknowledged that she had contributed none of this money to the great-aunt for the support of J.G. Jr.

Asked how she would care for J.G. Jr. if the boy was placed in her custody, the mother stated that she had some education, that she had some money saved ("[i]t may not be much, but it's ... money"), that she would take her son to medical appointments, and that the father, J.G. Sr., whom she married in August 1999, was paying for medical insurance for J.G. Jr. The mother did not make it clear whether, if she regained custody, she and J.G. Jr. would be living with the boy's father (who was by this time her husband), but there is no indication that the father, who was apparently in more favorable economic circumstances than the mother, was prepared to (or would be eligible to) live in Section 8 public housing for which the mother claimed to be on the waiting list.

The father also testified in opposition to the proposed adoption.[10] He claimed that, although he was in debt, he owned a two-bedroom condominium in Oxon Hill, Maryland, that he had money saved, that he paid for J.G. Jr.'s health insurance, that his relationship with the mother was "still good,"[11] that he had family support, and that although he had four children altogether, all apparently with the mother, he would be able to provide a home for his son. The father admitted that his visits to his son were rare, but he asserted that the social workers were unhelpful and that he had to travel on his job. He admitted that he paid no child support to the great-aunt (with whom he was not on speaking terms), "because I felt that I should pay child support to the mother who birthed my children." Called to the stand as a rebuttal witness, the great-aunt testified that she paid for J.G. Jr.'s health insurance and that at no time during the history of the case had the father claimed that he had health insurance for his son or that he was willing to pay for J.G. Jr.'s medical expenses.

### D. *The trial judge's decision.*

At the conclusion of the evidentiary hearing, the trial judge delivered an oral

---

8. The mother ultimately asserted that the money in question was in a "little safe."

9. The mother claimed that she earned $6.00 per hour working forty hours per week. She also asserted that she had earned approximately $1,000.00 per year. The trial judge was perplexed by this testimony and concluded that the mother, although a high school graduate, was unable to do basic arithmetic.

10. The father has not appealed from the trial judge's decision. We therefore discuss only those portions of his testimony that bear on the mother's appeal. Moreover, we note that the trial judge rejected much of the father's testimony as untruthful and incredible, and that this rejection was based in substantial part on the judge's assessment of the father's demeanor.

11. The father and the mother were not living together at the time of the hearing. According to the father, a social worker had advised him that if he and the mother were in the same household, it was unlikely that J.G. Jr. would be returned to her, presumably because of suspected domestic violence on the father's part. The father denied abusing the mother, but the judge did not credit the denials; however, no direct evidence of spousal abuse by the father was presented to the court.

decision, which he followed up ten days later with a more detailed "Memorandum of Finding of Facts, Conclusions of Law and Order." In his written decision, the judge found "beyond a reasonable doubt," *inter alia,* that both parents had withheld their consents to J.G. Jr.'s adoption contrary to the boy's "best interests" within the meaning of D.C.Code § 16–304(e),[12] and that the requirement that each parent consent should be waived. The judge found that the great-aunt was a credible witness who was "fully committed and dedicated to the child's welfare to the same extent [as] one would expect of a birth mother caring for her own child." The judge essentially rejected the father's testimony as incredible. With respect to the mother, the judge found, in pertinent part, as follows:

> On direct examination, [the mother] was vague as to how frequently she visited. She candidly admitted that some visits were "missed on my part." She claimed she got several outfits for [J.G. Jr.], but not enough and that the petitioner told her that he did not need anything. She acknowledged being on public assistance and thus did not bring any toys or things like that. She admitted that she could not take care of [J.G. Jr.,] right now as she was waiting for Section 8 housing and was now homeless. On cross-examination, she acknowledged she had not supported the child financially even though she had worked part-time, but was now on maternity leave for the past two (2) months. She said she was trying to save to get housing and had saved $600, but that was down

to $400[13] at the time of the hearing. When cross examined by the GAL,[14] she mentioned that she had earned a couple of thousand dollars a year and that when she worked in security she got $6.00 per hour.

> Upon questioning by the [c]ourt, she stated she was now 25 and had gone to school through the 12th grade. The vagueness of her answers and their content did not reflect a 12th grade education, but a much lower level of comprehension and ability to manage her own affairs. She appeared to be functioning at the 6th or 7th grade level and not even to appreciate the process of birth control and how this affected her health and her ability to substantively parent children. She had her first child on February 4, 1996, who died, then a second child in February 1997, and nine (9) months later her third child, and then 10 months later—fraternal twins, one of whom died, and her 6th child in April 2000 and was 8 months pregnant when on the witness stand on December 11, 2001. Her answers indicated a lack of parenting skills and [a lack of] appreciation of the time and energy required to spend time with children individually to mold their character and development. [W]ithout reservation, from the substance of her testimony, this [c]ourt concluded beyond a reasonable doubt that she lacks the capacity to be an effective parent and to meet even minimal standards of functioning parenting other than the biology of giving birth. In this connection, this [c]ourt notes that the neglect findings of fact reflected that

12. The judge also indicated that the consents should be waived on the grounds of abandonment. The mother vigorously and plausibly denies that she abandoned J.G. Jr., and in light of our disposition of the appeal on other grounds, we need not decide° whether her conduct constituted abandonment.

13. According to the mother's testimony the amount saved was down to $480.00.

14. GAL stands for Guardian *Ad Litem.*

when the child was removed from her home in September 1997, the home was dirty and unkempt—the bathroom had clothes piled in the bathtub and the kitchen had dirty baby bottles and dirty dishes in the sink.

The judge waived the parental consent requirement for adoption, and he concurrently issued a final decree of adoption. The mother filed a timely notice of appeal.

## II.

## LEGAL ANALYSIS

### A. *Standard of Review.*

■ The determination whether a birth parent's consent to the adoption of a child has been withheld contrary to the child's best interest is confided to the trial court's sound discretion. *In re Petition of P.S.*, 797 A.2d 1219, 1223–24 (D.C.2001). This court must determine whether the trial court's decision to terminate a parent's rights is supported by clear and convincing evidence, and we must be satisfied that "the possibility of an erroneous judgment does not lie in equipoise between the two sides." *In re K.A.*, 484 A.2d 992, 996 (D.C.1984). An appellate court may not "redetermine the credibility of witnesses where, as here, the trial court had the opportunity to observe their demeanor." *P.S.*, 797 A.2d at 1224 (quoting *In re E.H.*, 718 A.2d 162, 169 (D.C.1998)).

### B. *Statutory background.*

■ In general, "[a] petition for adoption may not be granted by the court unless there is filed with the petition a written statement of consent ... signed and acknowledged ...[, *inter alia*,] from both parents if they are alive." D.C.Code

§ 16–304(a) to (b)(2)(B). The statute further provides, however, that

> [t]he court may grant a petition for adoption without any of the consents specified in this section, where the court finds, after a hearing, that the consent or consents are withheld contrary to the best interest of the child.

*Id.* § 16–304(e). Where a biological parent declines to consent to a proposed adoption, the prospective adoptive parent must ordinarily show by clear and convincing evidence that consent is being withheld contrary to the child's best interest. *In re J.D.W.*, 711 A.2d 826, 832 (D.C.1998).

■ "An adoption over a biological parent's objection effectively terminates that parent's interest ...." *In re L.W.*, 613 A.2d 350, 356 (D.C.1992). Accordingly, we have applied the provisions of the District's termination of parental rights (TPR) statute, D.C.Code § 16–2353(b), in contested adoption proceedings of the kind presently before us. *Id.; see also P.S., supra,* 797 A.2d at 1224. Section 16–2353(b) provides, in pertinent part, as follows: [15]

> (b) In determining whether it is in the child's best interests that the parent and child relationship be terminated, a judge shall consider each of the following factors:
>
> (1) the child's need for continuity of care and caretakers and for timely integration into a stable and permanent home, taking into account the differences in the development and the concept of time of children of different ages;
>
> (2) the physical, mental and emotional health of all individuals involved to the

---

**15.** We have omitted from our quotation of the TPR statute a provision relating to "boarder babies" left at the hospital following their birth, § 16–2353(b)(3A), as well as a second provision which addresses the continued existence of drug use in the home, § 16–2353(b)(5), because neither of these subsections bears on any issue in this appeal.

degree that such affects the welfare of the child, the decisive consideration being the physical, mental and emotional needs of the child;

(3) the quality of the interaction and interrelationship of the child with his or her parent, siblings, relative, and/or caretakers, including the foster parent;

. . . .

(4) to the extent feasible, the child's opinion of his or her own best interests in the matter . . . .[16]

We will return to the criteria in § 16–2353 after a brief discussion of the basic principles which may be extracted from the case law.

C. *Applicable legal principles.*

▮▮▮ The termination of parental rights is a "drastic remedy," and may be ordered only upon a showing of "clear necessity." *In re A.S.C.,* 671 A.2d 942, 951 n. 14 (D.C.1996); *see also In re Application of L.L.,* 653 A.2d 873, 887 (D.C.1995). This is so because a birth parent has a "fundamental liberty interest" in the care, custody or control of her child. *See, e.g., Troxel v. Granville,* 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *L. W.,* 613 A.2d at 355. "Although a neglect proceeding is remedial and focuses on the situation of the child rather than [of] the parent, the rights of the parent are not to be overridden lightly." *In re Ak.V.,* 747 A.2d 570, 577 (D.C.2000) (citations omitted).

"[A] child's best interests are presumptively served by being with a parent, providing that the parent is not unfit." *[In re] S.G.,* 581 A.2d [771,] 785 [ (D.C. 1990) ]. This holds true even where, in a contest between a biological parent and a non-parent, the latter is in more favorable financial circumstances. *Bell v. Leonard,* 102 U.S.App. D.C. 179, 184, 251 F.2d 890, 895 (1958).

. . . .

As the court stated in *Bell, supra,* 102 U.S.App. D.C. at 184 n. 20, 251 F.2d at 895 n. 20 (quoting *People ex rel. Kropp v. Shepsky,* 305 N.Y. 465, 469, 113 N.E.2d 801, 804 (1953)), "[i]n . . . no case may a contest between parent and non-parent resolve itself into 'a simple factual issue as to which [affords] the better surroundings, or as to which party is better equipped to raise the child.' . . . And that is true even if the nonparent initially acquired custody of the child with the parent's consent."

*L.W.,* 613 A.2d at 356 & n. 13. More recently, we had occasion to emphasize that our child neglect statute, like its Pennsylvania counterpart,

was not intended to provide a procedure to take the children of the poor and give them to the rich, nor to take the children of the illiterate and give them to the educated, nor to take the children of the crude and give them to the cultured, nor to take the children of the weak and sickly and give them to the strong and healthy.

*In re T.W.,* 732 A.2d 254, 262 (D.C.1999) (quoting *In re Rinker,* 180 Pa.Super. 143, 117 A.2d 780, 783 (1955)). In other words,

---

**16.** Although the great-aunt testified that J.G. Jr. and his mother loved one another, and although the judge found that J.G. Jr. had made an excellent adjustment in the great-aunt's care, no evidence was introduced with respect to the youngster's own preference. Given J.G. Jr.'s tender years—he was less than five years old at the time of the hearing—and in light of his limited acquaintance with his biological mother, there was no error in failing to ascertain J.G. Jr.'s opinion of his own best interests. *See In re A.R.,* 679 A.2d 470, 478–79 (D.C.1996) (termination of parental rights held to be permissible without ascertaining the preference of a six-year-old boy who barely knew his father).

a parent's poverty, ill health, or lack of education or sophistication, will not alone constitute grounds for termination of parental rights.

 Notwithstanding the presumption in favor of the birth parent, however, we have repeatedly held that the parent's rights may and must be overridden when such a drastic measure is necessary in order to protect the best interests of the child. *See, e.g., L.L.,* 653 A.2d at 880; *L. W.,* 613 A.2d at 356; *In re A. C.,* 597 A.2d 920, 925 (D.C.1991); *In re D.R.M.,* 570 A.2d 796, 804–05 (D.C.1990); *K.A.,* 484 A.2d at 997–98. It is the "court's first duty ... to protect [J.G. Jr.] from any unwarranted danger of harm." *L.L.,* 653 A.2d at 886. Furthermore, there is a strong public policy, enhanced by federal legislation,[17] disfavoring the protracted retention of children in foster care, and a "wait and see" option indefinitely deferring adoption or termination of parental rights (leaving a child in "legal limbo" for the foreseeable future) is inappropriate where a birth parent's ability to reunite with the child within a reasonable time is entirely speculative. *Id.* at 887–89.

### D. *The TPR factors.*

With the foregoing case law as background, we turn to the TPR factors set forth in D.C.Code § 16–2353(b), and reproduced at page 999–1000, *supra.* The trial judge, who appeared to be focusing, in part, on the issue of abandonment, did not explicitly invoke the statutory criteria, and the record thus contains no explicit findings with respect to each relevant provision. Nevertheless, we conclude that the judge made findings which satisfy each of these criteria, and that his findings are supported by clear and convincing evidence.

(1) *J.G. Jr.'s need for continuity of care and caretakers and for timely integration into a stable and permanent home. D.C.Code § 16–2353(b)(1).*

 The judge heard and credited testimony—indeed, it was undisputed—that J.G. Jr. had lived continuously with his great-aunt from the age of seven months. The judge also found that J.G. Jr. had made an excellent adjustment in the great-aunt's home:

> This [c]ourt found from the content of [the great-aunt's] answers and her manner of responding that she was fully committed and dedicated to the child's welfare to the same extent one would expect of a birth mother in caring for her own child. The social worker, Donita King, testified that she had observed the child with the caretaker-petitioner and he had made an excellent adjustment in her care. She makes sure he sees the doctor as required and he is now healthy and thriving. She has him in Day School and he is now making excellent progress. She concluded that she has "no concerns" about the quality of care the Petitioner is giving the child and would recommend adoption.[18]

By contrast, the boy had not lived with his mother since the shameful abuse to which he was subjected during the first

---

17. *See* the federal Adoption Assistance and Child Welfare Act of 1986 (AACWA), 42 U.S.C. §§ 670 *et seq.,* discussed in detail in *L.L.,* 653 A.2d at 888.

18. Parts of the judge's findings relating to the great-aunt appear to be based on a report written by Ms. King rather than on her oral testimony. The subject of the evidentiary hearing was whether the requirement that each parent consent to the adoption should be waived, and not whether the great-aunt was qualified to adopt. No issue has been made of this by the mother, and the report is no doubt relevant to the second step of the procedure, *i.e.,* the approval of the great-aunt as the adoptive parent.

seven months of his life. The record demonstrates beyond dispute that at the time of the hearing, and by her own admission, the mother was unable to provide a home for J.G. Jr. at all. Moreover, the prospects that she could offer J.G. Jr. continuity of care, stability, and permanence in the foreseeable future were so speculative as to be effectively non-existent. In the four years since J.G. Jr. was removed from her care, the mother had made virtually no effort or progress towards reintegrating her son into her home. She apparently hoped to lived with him in "Section 8" public housing; the father, to whom the mother is married, contemplated that J.G. Jr. would live with him, with or without the mother, in Oxon Hill, Maryland. This critical difference in the expectations of the two parents demonstrates the speculative character of any plan to reunify J.G. Jr. with his parents or with either one of them.

If the petition for adoption had been denied, J.G. Jr., who remained a neglected child for whom the mother was in no position to make a home, would have been left in "legal limbo" for an uncertain period of time, with no visible light at the end of the tunnel. The judge's findings, quoted at pages 998–99, *supra*, are consistent with this record, and his conclusion that the mother lacked the capacity to be an effective parent, while perhaps not compelled by the evidence, could reasonably be viewed in light of the record as a whole, as having been established by clear and convincing evidence.

(2) *The physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive consideration being the physical, mental and emotional needs of the child. D.C.Code § 16–2353(b)(2).*

■ The trial judge did not articulate his findings in terms of this criterion, but those that he did make leave no doubt as to how he viewed this issue. The finding, quoted at pages 1001, *supra*, that J.G. Jr. had made an excellent adjustment in the great-aunt's custody and that the great-aunt was "fully committed" to his welfare demonstrates that, in the judge's view, the "physical, mental and emotional needs of the child" were being fully met.

There was evidence, on the other hand, that J.G. Jr. had been seriously abused in the home of his biological parents. "[C]hild abuse[, like spousal abuse,] does not ordinarily consist of a single isolated act of molestation," *L.L.*, 653 A.2d at 881 (quoting *In re S. G.*, 581 A.2d at 778 n. 11), and, although several years had passed since the unconscionable treatment of J.G. Jr. during his infancy, the judge was obliged to include in his calculus the possibility that such conduct could recur. Moreover, where, as in this case, a small child has spent almost his entire life in the care of the prospective adoptive parent, and where his contact with his birth mother has been quite limited, it may be damaging to the child's welfare to extract him from the only home he has ever known. *See L.W.*, 613 A.2d at 355; *cf. In re Hazuka's Adoption*, 345 Pa. 432, 29 A.2d 88, 90 (1942).

The judge further found that the mother was intellectually limited, that she lacked parenting skills, and that her interest in her son was likewise limited; she contributed none of her claimed earnings to his support, never gave him a single gift (even the teddy bear suggested by the great-aunt), and, at least until shortly before the hearing, visited him only sporadically. Although the great-aunt acknowledged that J.G. Jr. and his mother loved each other—testimony that the trial judge unaccountably failed to mention either in his oral decision or in his written findings—we conclude that the existence of love from a

virtual stranger could not satisfy J.G. Jr.'s emotional needs.

(3) *The quality of the interaction and interrelationship of the child with his or her parent[s], siblings, relative[s], and/or caretakers, including the foster parent.* D.C.Code § 16–2353(b)(3).

■ The evidence and the judge's findings relevant to this TPR criterion have largely been covered by our discussion of the other two criteria. The quality of the interaction between J.G. Jr. and his mother after the boy was removed from the mother's home could fairly be characterized as favorable but fragmentary.[19] Unfortunately, no evidence was introduced by either party as to the whereabouts of J.G. Jr.'s siblings or as to his relationship, if any, with them. As previously noted, and although this was not the focus of the hearing, there appears to be no question that the interaction between J.G. Jr. and his great-aunt was favorable.

The foregoing discussion demonstrates, in our view, that the judge's findings and the evidence in the record are overwhelmingly favorable to the great-aunt's position with respect to the first two TPR criteria. The evidence as to the third is somewhat fragmentary, but what we have is likewise favorable to the great-aunt's position.

■ Our task would certainly have been easier if the trial judge had expressly applied the criteria set forth in § 16–2353(b) and had framed his findings accordingly. Theoretically, we could remand the case for new findings more closely and explicitly linked to the provisions of the TPR statute.[20] But given the emphatic character of the judge's findings—"beyond a reasonable doubt" rather than the required "clear and convincing evidence"—and the compelling evidence that the mother offered no realistic alternative to adoption, we are satisfied that any rephrased findings on remand would not alter the

19. In an earlier version of his findings, the trial judge had written that, according to the social worker, "while the parents had sporadic visits with the child, the interaction between them was not that of parent and child but more of a child with adult playmates." On January 25, 2002, the judge amended his order to state that this "adult playmate" relationship existed only between J.G. Jr. and his father.

20. In this connection, we also note that, especially in his oral findings, the judge placed a great deal of emphasis on the frequency with which the mother had children and on the difficulties that her pregnancies created for her plan, if there was one, to regain custody of J.G. Jr. In his ruling from the bench, the judge stated:

And with reference to the mother, there is what they call birth control. There is a question of [—]space the children out if you, your health is jeopardized, you've got [a] pregnancy problem. Have a child every three years, not every year, so that those that you do have, that you already have here you could take care of. And [the]

statute talks about physical, mental[ ] and emotional capacity. That includes willpower to make the sacrifice to be an effective parent, not just giving birth to a piece of flesh on bones, but make yourself available to instill values and morality and developing inner character with the child and not just engage in sex and every nine months drop a child. The mother has a duty to control her health, that maybe some women even have their tubes tied. But maybe you don't have to go that far, but there is what they call birth control, you control ... how frequently you have children and [preventive] health maintenance so that you can be an effective mother. And I don't think she's done that here.

Although the judge's point that the mother's repeated pregnancies inhibited her visitation, and her ability to care for J.G. Jr., was not unreasonable, the references, *inter alia*, to "every nine months drop[ping] a child" and to "hav[ing] their tubes tied" were unnecessary and, in our view, ill-advised. Nevertheless, we discern no basis for reversing the judgment on account of the judge's infelicitous phraseology.

result that the judge reached, so that a remand would be both unnecessary and futile. "Simply stated, 'the law does not require the doing of a futile act.'" *Hercules & Co. v. Shama Rest. Corp.*, 613 A.2d 916, 921 (D.C.1992) (quoting *Ohio v. Roberts*, 448 U.S. 56, 74, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980)); *see also In re Melton*, 597 A.2d 892, 908 (D.C.1991) (en banc). Accordingly, we do not believe that a remand is appropriate.

## III.

## CONCLUSION

We recognize that it is no small matter for a court to permit the adoption of a child over the objection of a mother who loves him. We are not unmindful of the responsibility that has been placed upon both the trial court and the appellate court where a small child's future is at stake. We also recognize that this case implicates the mother's liberty interests, and that termination of her parental rights may be ordered only if such a drastic remedy is essential to the well-being of the child. The record and the trial court's findings, however, demonstrate that the trial judge did not abuse his discretion in determining that adoption is necessary to protect this child from protracted legal limbo and from the danger of other untoward consequences, and to afford him a stable and permanent home which the birth mother cannot provide. We note, in conclusion, that the custody of J.G. Jr. remains within the family; that the adoptive mother is,

after all, the birth mother's aunt; and that even after adoption, the adoptive mother may well find it beneficial to J.G. Jr. to permit the birth mother to remain a part of his life.

*Affirmed.*[21]

WAGNER, Chief Judge, dissenting:

The trial court's decision to sever permanently the child's relationship with the mother and free him for adoption was based on two grounds, neither of which was established by clear and convincing evidence as required. The first was based on abandonment under D.C.Code § 16–304(d); however, this section bars such a finding where it is shown that the parent's failure is unintentional and due to poverty. This record shows unequivocally that the twenty-five year-old mother of five children was without financial resources of her own, and her husband failed to contribute to her support or the support of the child unless she lived with him. If she lived with her husband, neither her aunt nor the system would lend support because of her husband's alleged abuse. While the mother's case was in the system, no one bothered to counsel her on the potential availability of court-ordered child support, which could be pursued on her behalf by the Corporation Counsel. *See* D.C.Code § 16–2341 (1981); *see also M.B. v. District of Columbia*, 478 A.2d 1087 (D.C.1984). Public assistance for the child was provided, not to the mother, but only to the mother's aunt, the petitioner in this case. Thus, this homeless mother had no sup-

---

**21.** In *In re Baby Boy C.*, 630 A.2d 670, 682 (D.C.1993), this court, after discussing the Supreme Court's decision in *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), held that

contrary to appellant's assertion, a finding of parental unfitness is not a constitutional prerequisite to granting an adoption petition notwithstanding lack of parental con-

sent. *See In re L.W., supra*, 613 A.2d at 356; *accord, e.g., In re P.G.*, 452 A.2d 1183, 1184 (D.C.1982).

*See In re A.W.*, 569 A.2d 168, 169 (D.C.1990) (stating that termination of parental rights is permissible if mother will not be a fit parent, or will not be able to provide appropriate care, "in the near future"); *cf.* dissenting opinion, *post* at 21–22.

port from family or social services. She designated her aunt to care for the child, J.G. Jr., because she could not do so without resources. Witnesses for both sides testified that the mother visited her child except for periods when she had difficult pregnancies or when visits were impeded by the schedules of the petitioner or the social worker. She attended parenting classes as required. It is unrefuted that the mother loved the child and that the child loved her. Thus, the evidence was clear and convincing that the mother did *not* abandon her child, and the first ground for the trial court's ruling under D.C.Code § 16–304(d) fails.

The second basis for the trial court's ruling is the court's conclusion that the child's best interest would be served by severing the parent-child relationship and freeing the child for adoption. Appellant argues, somewhat persuasively in my view, that there must be some showing of the parent's unfitness before this drastic step is taken, and there was no such showing. *See Santosky v. Kramer*, 455 U.S. 745, 760 n. 10, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) and *Quilloin v. Walcott*, 434 U.S. 246, 255, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978). While this court, as the majority points out, has said that "a finding of parental unfitness is not a *constitutional* prerequisite to granting an adoption petition notwithstanding lack of parental consent[,]" it has held nevertheless that parental fitness is an important consideration in deciding whether to sever permanently a parent-child relationship in adoption and termination of parental rights proceedings. *See, e.g., In re Baby Boy C.*, 630 A.2d 670, 671, 680 (D.C.1993) (quoting *Appeal of H.R.*, 581 A.2d 1141, 1143 (D.C.1990) (emphasis added) (the "best interest of the child" standard incorporates " 'a preference for a *fit* unwed father who has grasped his opportunity interest' ")); *accord, In re L.W.*, 613 A.2d 350, 356 (D.C.1992); *In re C.T.*, 724

A.2d 590, 599 (D.C.1999) (order terminating parental rights reversed where the trial court failed to give adequate consideration to the limited duration of the father's unfitness and that he might become a suitable parent in the foreseeable future); *see also In re S. G.*, 581 A.2d 771, 785 (D.C. 1990) (citations omitted) (reaffirming "that a child's best interests are presumptively served by being with a parent, provided that the parent is not unfit"). This preference accorded a fit parent may be overcome by clear and convincing evidence that the proposed adoption is in the best interest of the child. *Appeal of H.R.*, 581 A.2d at 1143. However, evidence meeting that standard is not present in this record.

While the circumstances which brought this case into the court system are extremely grave, there was no effort to present any clear picture of what occurred in the interim. Most of the information provided about the mother in the meantime was positive. Both the social worker and the petitioner testified that the mother visited and loved the child. Although she did not contribute financially to the child's support, there was clear evidence that her resources were meager and insufficient to provide even for her own shelter. There was evidence that the mother was living with a godmother at the time of the hearing. However, no effort was made to ascertain and inform the court of the conditions under which she was living with her other children at the time pertinent to the court's consideration. Before such a drastic step of terminating a parent's relationship with a child is taken, some effort should be made by the party having the burden of proof to present sufficient evidence to carry it. That simply was not done in this case. The attempt by the majority to glean from the trial court's findings some serious examination of the evidence against the factors for consider-

ation in terminating parental rights does not fill in the serious void of evidence.[1] For these reasons, I respectfully dissent.

1. Since an adoption over a natural parent's objection effectively terminates his or her parental rights and interest, we have upheld the application of the statutory standards for termination of parental rights in such proceedings. *L.W., supra,* 613 A.2d at 356 (citation omitted). These standards include: (1) the child's need for continuity of care; (2) the physical, mental and emotional health of all individuals involved; (3) the quality of interaction and interrelationship of the child with parents, siblings, relatives, caretakers (including foster parents); (4) when feasible, the child's opinion of his best interest; (5) evidence of continued drug activity in the home after intervention and services have been provided pursuant to D.C.Code § 16–2353(b) (1989).