870 A.2d 82 (2005)
In re Petition of F.W. & D.T.;
G.G., Appellant.
Nos. 03-FS-612, 03-FS-653.
District of Columbia Court of Appeals.
Argued June 15, 2004.
Decided March 17, 2005.
*84 Lucy Vera Osakwe, Silver Spring, MD, appointed by this court, for appellant.
David D. Smyth III, with whom Charles G. Cole, Washington, DC, was on the brief, for petitioners.
Claude L. Matthews, Washington, DC, filed a brief in support of petitioners as Guardian Ad Litem for Je.G. and Ja.G.
Before RUIZ, GLICKMAN and WASHINGTON, Associate Judges.
PER CURIAM:
Appellant, G.G., appeals the trial court's waiver of her consent to adoption and termination of her parental rights with regard to her children Je.G. and Ja.G. G.G. contends that the trial court lacked clear and convincing evidence necessary to waive her consent; that the trial court failed to adequately weigh issues of race, culture, and gender in reaching its decision; and that actions or omissions of the responsible social services agency should have caused the trial court to deny the adoption petitions. We affirm the trial court's decision.

I.
Je.G. and Ja.G. were committed to foster care in October 2000, after the trial court found them neglected in accordance with a stipulation signed by G.G.[1] In April 2001, foster parents F.W. and D.T. filed petitions to adopt the children. G.G. and her husband J.G., who is the father of the children, objected to the proposed adoptions. After holding a consolidated hearing to show cause why the parents' consents to the adoptions should not be waived, the court found that the parents had withheld their consents contrary to the children's best interests and waived consents of the parents to the adoptions. On December 20, 2002, the court issued its findings of fact, conclusions of law, and judgment, and in April 2003, the court issued final decrees of adoption for the children.

*85 II.
The trial court can waive otherwise necessary parental consents to a proposed adoption if the court determines that the parents are withholding their consents contrary to the child's best interests. See In re P.S., 797 A.2d 1219, 1223 (D.C.2001); D.C.Code § 16-304(a)-(b)(2)(B), (e) (2001). We review such a determination for abuse of discretion. In re P.S., 797 A.2d at 1224; In re D.R.M., 570 A.2d 796, 803-804 (D.C.1990). "Such a finding must be supported by clear and convincing evidence," In re W.E.T., 793 A.2d 471, 478 (D.C.2002), "`such that the possibility of an erroneous judgment does not lie in equipoise between the two sides.'" In re J.G. Jr., 831 A.2d 992, 999 (D.C.2003) (quoting In re K.A., 484 A.2d 992, 996 (D.C.1984)). "Clear and convincing evidence is evidence which will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. It does not mean clear and unequivocal." In re W.E.T., 793 A.2d at 478 n. 15 (internal quotation marks and citation omitted).
In making its determination, the trial court must weigh the same factors as those weighed in a termination of parental rights proceeding. See In re J.G. Jr., 831 A.2d at 999; In re P.S., 797 A.2d at 1223; In re A.W.K., 778 A.2d 314, 325 (D.C.2001). The factors to be considered here are:[2]
(1) the child's need for continuity of care and caretakers and for timely integration into a stable and permanent home, taking into account the differences in the development and the concept of time of children of different ages;
(2) the physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive consideration being the physical, mental and emotional needs of the child;
(3) the quality of the interaction and interrelationship of the child with his or her parent, siblings, relative, and/or caretakers, including the foster parent; ... [and]
(4) to the extent feasible, the child's opinion of his or her own best interests in the matter....
§ 16-2353(b); see also In re P.S., 797 A.2d at 1223-24.
We disagree with appellant's contention that the evidence was insufficient for the trial court to find that clear and convincing evidence supported waiver of parental consents. As it was entitled to do, the trial court specifically credited testimony from social workers Donita King-Holmes, Donna Liu, and Nicole Gilbert, and witness F.W. The court discounted conflicting testimony from one less-experienced social worker, Anthony Ogbonnaya, and from the biological parents, who had disputed and failed to explain injuries that another of their children had sustained. This court will not "`redetermine the credibility of witnesses where, as here, the trial court had the opportunity to observe their demeanor and form a conclusion.'" In re P.S., 797 A.2d at 1224 (quoting In re E.H., 718 A.2d 162, 169 (D.C.1998)).
The credited testimony and other evidence was ample to establish the first and third § 16-2353 factors  that both children needed and had enjoyed continuity of care in the petitioners' home, were well-integrated into the petitioners' family, and enjoyed positive interactions within that family  by the clear and convincing *86 standard. See § 16-2353(b)(1), (3). "[A] stable and desired environment of long standing should not be lightly set aside." In re W.E.T., 793 A.2d at 478 (internal quotation marks and citations omitted). Je.G. had lived with the petitioners for all but nine months of his life, and Ja.G. had lived with the petitioners virtually her entire life. Testimony was presented that the petitioners' other children were loving and affectionate with the G. children, and several witnesses provided consistent testimony about the high degree of bonding of the children to the petitioners. In contrast, the court heard conflicting testimony regarding the existence and degree of bonding of the children to the birth parents, and the court discredited the testimony from Ogbonnaya that the children were bonded to the birth parents.
Clear and convincing evidence also supported the court's findings with regard to the second § 16-2353 factor, "the physical, mental and emotional health of involved individuals" as it affected the welfare of the children with "the decisive consideration being the physical, mental and emotional needs of the children." See § 16-2353(b)(2). Je.G.'s special needs[3] brought an extra dimension to this factor with respect to consent for his adoption, as "[a]n individual who is able to parent a child with advanced or average skills may nevertheless be unable to carry out the additional responsibilities required to raise a child with special needs." In re P.S., 797 A.2d at 1224 (quoting In re E.H., 718 A.2d at 170).
Regarding the petitioners, the court heard testimony about their long-term commitment to each other, steady employment, and manner of caring for all the children in their household. The court also heard testimony regarding the biological parents' failures to complete all counseling and parenting sessions; their failure to attend therapeutic sessions with Je.G. consistently; their employment situations; their failure to provide gifts or support to the children; their failure to apply parenting skills during supervised visits; and G.G.'s mistrust of employers and the social care system. This testimony was equally pertinent to the question of each child's best interests. Regarding Je.G. specifically, the court heard testimony about the petitioners' abilities to meet his special needs and his progress under their care. The court contrasted this with the testimony of the biological parents, who denied that Je.G. had exhibited developmental and health problems when he was placed with the petitioners and who were not well-informed about his special needs.
We also disagree with appellant's second contention, that the trial court failed to weigh adequately the issues of race, culture, and gender in reaching its determination. "[R]ace is simply a factor that may be considered by the trial court in the process of determining the best interests of the child," which "pale[s] into insignificance when we compare the health needs of th[e] child...." In re P.S., 797 A.2d at 1225 (citing In re D.I.S., 494 A.2d 1316, 1326-27 (D.C.1985)). Here, the court heard testimony from multiple parties regarding race and associated cultural-family identity concerns and squarely addressed them in its ruling. The petitioners, who are described as Caucasian, had two older African-American children in their family. The court heard testimony about these children and their relationships *87 with the G. children, as well as testimony about the petitioners' sensitivity to issues of cultural and racial heritage and their efforts to promote the children's racial identities and awareness of their heritage.
Regarding gender and the availability of male role models for the boy Je.G., the court heard testimony that the petitioners, who are both female, have an older male child in their family and testimony about the children's positive interactions. The fact that petitioners are a same-sex female couple cannot, in itself, be presumed contrary to Je.G.'s best interests. See In re M.M.D., 662 A.2d 837, 859 (D.C.1995) (holding that "unmarried couples, whether same-sex or opposite-sex, who are living together in a committed personal relationship, are eligible to file petitions for adoption"); see also In re T.J., 666 A.2d 1 (D.C.1995) (reversing trial court's grant of adoption petition by same-sex foster parents solely on the ground that the mother's choice of a different, fit custodian was not properly considered).[4]
With the best interests of the children as the focus, ample testimony existed to support a finding of waiver of consent pursuant to the relevant factors enumerated in § 16-2353(b) by clear and convincing evidence.[5] We are satisfied that the trial court did not abuse its discretion in making its determination.
Lastly, we disagree with appellant's third contention, that the court should not have granted the adoption petitions because the social services agency failed to provide adequate assistance to reunite the children with their birth parents and interfered with the bonding process between the children and their birth parents. "[W]hile agencies have an obligation to provide services and facilitate family reunification, this court has found no statutory requirement that such agency action is a condition precedent to the commencement of a termination of parental rights proceeding since the overriding consideration is the best interests of the child." In re P.S., 797 A.2d at 1225 (quoting In re A.C., 597 A.2d 920, 924-26 (D.C.1991)).
We appreciate that "agency recommendations that create a presumption in favor of adoption are problematic when it becomes almost impossible to overcome this presumption irrespective of the efforts made by the natural parents." In re P.S., 797 A.2d at 1225 (citing In re D.R.M., 570 A.2d 796, 807 (D.C.1990)). Appellant argues that interference by the agency made bonding much more difficult, which in turn influenced the agency's recommendation and the appearance of what placement was in the best interests of the children. Although the testimony of social worker Ogbonnaya supported appellant's argument, the court gave greater credence to the testimony of the other, more experienced social workers. Evidence was presented that the agency fulfilled its obligation to provide services and facilitate reunification, particularly in that the agency *88 offered referrals to the birth mother for housing, employment, and therapy while reunification was the goal. Allegations of other agency action that did not support or that interfered with the birth parents' bonding do not, in our view, overcome the substantial evidence summarized above supporting a finding that waiver of consents was warranted for the best interests of the children.
For the foregoing reasons, we affirm the trial court's decisions waiving appellant's consent to adoption, terminating her parental rights with respect to Je.G. and Ja.G., and granting the petition for adoption.
RUIZ, Associate Judge, concurring in part and dissenting in part.
This case presents a difficult choice on appeal from the trial court's determination that the best interests of the children require that a parent's consent to adoption should be waived in order to facilitate their permanent incorporation into an adoptive family. Our review on appeal in these cases is appropriately limited, out of deference to the trial court's more immediate assessment after a hearing, to whether the trial court's findings are clearly erroneous, whether the findings amount to clear and convincing evidence, and whether the decision to waive parental consent is an abuse of discretion. See In re L.W., 613 A.2d 350, 359 (D.C.1992).
Our deference to the trial court, however, assumes a careful weighing of all relevant facts by the trial court, and the limitations on our scope of review do not mean that we may overlook clear deficiencies in the trial court's findings and conclusions. In this case, I have no difficulty affirming the trial court's waiver of the mother's consent to adoption with respect to the little boy, Je.G., whose health problems and consequent special needs were substantiated in the record and, as the trial court found, were denied by the parents and carefully and lovingly addressed by the adoption petitioners.[1] But there are two children involved in this case. Ja.G., the little girl, is barely mentioned in the trial court's findings and conclusions. There was no evidence that she had any of her brother's difficulties requiring specialized care; to the contrary, one of the adoptive parents as well as a social worker, Ms. Holmes, testified that Ja.G. suffered no developmental delays and was in good health when she was removed from her mother's care at the age of six weeks. The mother subsequently stipulated to neglect because she was unable to find "sanitary housing" for herself and her children. At that time, the mother was told by the social worker assigned to the case that to achieve reunification with her children, she needed to "secure stable housing, stable employment and to continue with individual therapy."
The only impression that can be gleaned from the judge's order is that both children were considered as a "unit" and that the special considerations applicable only to Je.G., came to overshadow any individualized consideration of Ja.G.[2] As a result, some of the trial court's generalized findings have a tenuous relationship to the evidence of record as they concern Ja.G. For example, the trial court's findings about deficiencies in the parents' interactions during visits with the children did not take into account the reports from Ms. *89 Holmes, whom the trial court expressly credited, that though she seemed unable to discipline the children, the mother "engaged and nurtured" the children during her visits and, specifically with respect to Ja.G., that she had "no problem" interacting with the infant.[3] The trial court's finding that the parents did not satisfactorily complete certain specified tasks during visits, such as changing dirty diapers, is not supported by Ms. Holmes's testimony that the mother attended the majority of the scheduled visitation sessions over the course of which she "occasionally" had to be prompted to change the children's diapers, but she eventually did so without any prompting at all. Although Ms. Holmes also testified that she had agreed with changing the goal from family reunification to adoption because of the parents' denial of the reasons why the children went into foster care and the lack of progress that the mother was making toward reunification, that testimony was accepted unquestioningly, without taking into account that Ms. Holmes admitted on cross-examination that one month before the goal was changed to adoption, she had authored a report to the court stating that the mother was in compliance with the reunification program, was visiting regularly, kept in regular contact with the social worker, appeared to be bonded with her children, had a part-time job, had completed parenting and anger management classes and was undergoing therapy. Another social worker credited by the trial judge, Ms. Liu, also testified that the mother complied the visitation schedule and that, to the extent visits were cancelled, it was not the mother's fault but rather due to problems at the agency, the foster parents or illness. Finally, although the trial judge found that at the time the children were removed from her care in 2000, the mother lived in a "deplorable, roach-infested apartment" and was homeless and refused referrals to shelters and shelter care throughout the neglect proceedings, the trial judge did not mention at all the apparently undisputed evidence that by the time of the hearing in 2002, the mother was living with her husband in a two-bedroom apartment in Oxon Hill, Maryland, was employed, and was taking care of a nine-month old daughter who, like Ja.G., appears not to have any special needs.
We have recognized that a parent who is unable to care for a child with special needs might well be able to care for a child who does not require exceptional parental resources. See In re E.H., 718 A.2d 162, 170 (D.C.1998). A termination of parental rights  or its equivalent, waiver of parental consent to adoption  is not a neglect proceeding, where by statute a judge can infer neglect of one child from the abuse of a sibling. See D.C.Code § 16-2301(9)(A)(v) (Supp.2004) ("The term `neglected child' means a child ... who is in imminent danger of being abused and another child living in the same household or under the care of the same parent, guardian, or custodian has been abused; ...."). In this case, the presumption is that a child's best interest is to be with her parents, see In re S.G., 581 A.2d 771, 785 (D.C.1990), a presumption that can be overcome only by a high standard of proof  clear and convincing evidence  that the mother's consent to adoption is being withheld contrary to the child's best *90 interest. Although the trial court recognized the parents' love for their children, it did not take cognizance of their fundamental liberty interest in preserving the relationship between parent and child, see Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), and was instead primarily compelled by the wish not to disrupt the child's successful incorporation into the adoptive family. That is no doubt an important factor, and only benign human concern can be ascribed to the judge who acts on that impulse; but unless it is weighed in conjunction with the other required considerations and the parent's right to raise a child, preserving a favorable status quo will always conclusively decide the issue against the parent and in favor of adoption. If that is to be the case, I submit that appellate review, undertaken after the die is cast, comes too late to be meaningful. See In re K.M.T., 795 A.2d 688, 690 (D.C.2002) (holding that change in permanency goal from family reunification to adoption is not final or appealable).
In light of the record and the dearth of findings with respect to Ja.G., I cannot say that "the possibility of an erroneous judgment does not lie in equipoise between the two sides." In re J.G., Jr., 831 A.2d 992, 999 (D.C.2003) (quoting In re K.A., 484 A.2d 992, 996 (D.C.1984)). Therefore, I would remand the case so that the trial judge can make individualized findings and conclusions regarding Ja.G., taking into account the additional and unexpected fact of the death of one of the adoption petitioners after the trial court hearing while the case was pending argument before this court. I come to this conclusion reluctantly and with regret, being mindful of the consternation caused by reopening the case and introducing uncertainty after even more time has passed with the child away from her parents and living in the care of the adoptive family  time during which she has continued to bond with the adoptive family, including her brother, and correspondingly has become more estranged from her parents.[4] If the right to appeal means anything, however, these difficult choices must be made. The only effective way to avoid harmful delay and disruption on appeal lies in the trial court's careful and express consideration.
NOTES
[1] At the time of the proceedings in this case, G.G. and her husband J.G. also were involved in adoption proceedings for another one of their children, J.G. Jr. In 2001, the Superior Court waived the consent requirement for adoption of J.G. Jr., in a ruling affirmed by this court. See In re J.G. Jr., 831 A.2d 992 (D.C.2003). J.G. Jr. was removed from his parents' home in 1997 because he had suffered multiple broken bones and fractures, hemorrhages, and other injuries, none of which his parents could explain adequately. See id. at 995.
[2] Omitted are the statutory provisions addressing abandonment of children at hospitals after their birth and evidence of continued drug activity in the home. See § 16-2353(3A), (5). Those provisions have no application to the facts of this case.
[3] Je.G. suffers from developmental delays attributed to his premature birth. Evaluations performed when he was twenty-one months old indicated that he was functioning at a six-to-nine month-old level in his growth and fine motor and language skills. Je.G. participates in physical, occupational, and speech therapies.
[4] We find no cause to remand for further proceedings here due to changed circumstances arising from the untimely death of petitioner F.W. during the pendency of this appeal. Although surviving petitioner D.T. did not testify, and there was conflicting testimony regarding her demeanor, overall the testimony that was presented sufficiently addressed the statutory factors with regard to both petitioners. Considering the quality and volume of that testimony and the need for expedited resolution in adoption cases, see In re J.A.P., 749 A.2d 715, 718-19 (D.C.2000); Super. Ct. Adoption R. 60, we think it unnecessary to take additional evidence.
[5] As the court noted, the children were not old enough to express their opinions of their best interests, the fourth § 16-2353 factor.
[1] Je.G., was born prematurely, at 25 weeks. A twin sister died in the hospital from lung failure the next day.
[2] The trial court's order, for example, at one point implies, contrary to the evidence, that Ja.G., has "special physical, mental and emotional needs."
[3] According to Ms. Holmes:

[The mother] would cuddle, she would pick up [Je].G She would play with him. She would engage him in play....
.... She wouldn't be able to simultaneously interact with Je.G., and Ja.G so after she would engage in play with Je.G., then she would provide attention to Ja.G., which would be to hold her, cuddle her, talk to her.
[4] The children were found neglected and placed with petitioners in 2000, the mother's right to consent to adoption was waived in 2002, and the appeal was heard in 2004.