797 A.2d 1219 (2001)
In re Petition of P.S. & F.E.S.; S.L.C., Appellant.
In re Petition of P.S. & F.E.S.; A.C., Appellant.
Nos. 99-FS-1217, 99-FS-1218.
District of Columbia Court of Appeals.
Argued October 18, 2001.
Decided December 11, 2001.[*]
Glenn H. Angelo, Columbia, MD and Daniel A. Guerriero, appointed by the court, for appellants.
*1220 Carla S. Rappaport, appointed by the court, for appellees, the prospective adoptive parents.
Robert R. Rigsby, Corporation Counsel, Charles L. Reischel, Deputy Corporation Counsel, and Sheila Kaplan, Assistant Corporation Counsel, filed a statement in lieu of brief, for appellee, the District of Columbia.
Before STEADMAN, REID and WASHINGTON, Associate Judges.
WASHINGTON, Associate Judge:
This case arises from the consolidation of a motion for termination of parental rights and an adoption proceeding involving a special needs child, A.S.C. Judge Arthur L. Burnett, Sr. held a show cause hearing pursuant to D.C.Code § 16-304(e) (2001) to determine if appellants, the birth parents (S.L.C., the mother, and A.C., the father), were withholding their consents to the adoption contrary to the best interests of the child. Following the show cause hearing, the trial court issued its October 1998 order, concluding that the adoption should proceed despite the objections of the birth parents because they were withholding their consents contrary to the best interests of the child; that the extant motion for termination of parental rights was now dismissed as moot; and that the Department of Human Services (DHS) should proceed with the required investigations in the adoption case. On August 12, 1999, Judge Zinora Mitchell-Rankin entered a Final Decree of Adoption.
On appeal, appellants argue that the trial court abused its discretion in finding that they withheld their consents to the adoption contrary to the best interests of the child. In addition, they argue that the Final Decree of Adoption should be reversed based on several grounds: during the show cause hearing, they were denied their constitutional right to confront and cross-examine the prospective adoptive parents, appellees F.E.S.[1] and P.S., or to present evidence challenging their fitness; there is no evidence on the record of bonding between F.E.S. and the child; there is no evidence of the suitability of F.E.S.'s home after her marriage to P.S.; and that there is no showing that emotional harm would result if the child were to be removed. We affirm.

I.
When born on April 5, 1989 to S.L.C. (birth mother) and A.C. (birth father), A.S.C. was a high risk, premature baby who weighed two pounds and eleven ounces. At the time of the child's birth, S.L.C. acknowledged that she used heroin and cocaine, and that she participated in a methadone treatment program. The child was born with and continues to suffer from respiratory and feeding problems, which required her continued hospitalization from the time of her birth until 1993.
Soon after A.S.C.'s birth, S.L.C. relocated to New York City to join A.C. When both were contacted in September 1989 by A.S.C.'s social worker at Howard University Hospital (Hospital) about the need for parental consent to perform surgery on the child, they withheld consent until December 1989. S.L.C. was known to be in the District of Columbia in November 1989, but she neither visited A.S.C. nor contacted the Hospital. After the same social worker informed S.L.C. of the need for her to visit her daughter at least twice per week, S.L.C. made only one visit. For the next eight months, neither birth parent visited their daughter nor contacted the Hospital. A neglect petition was filed *1221 against the parents in February 1990, and the trial court concluded that the child had been abandoned by her birth parents due to their failure to promptly provide medical consent and their failure to make reasonable efforts to visit with and care for the child.

1. The First Termination of Parental Rights Proceeding
The first termination of parental rights proceeding took place in November 1991. By that juncture, the birth parents had little or no contact with the child. Appellee F.E.S., formerly a recreational therapist at the Hospital for Sick Children (HSC), testified at that proceeding and indicated that she had undergone training in order to take the child out on day passes; that caring for the child was very complicated at first, but less so as she gained experience; that the equipment she was required to take home for the child's care included a five-foot oxygen tank, a portable oxygen tank, a feeding pump, medications, and various baby items; and that at that juncture, appellee did not feel she was in a position to adopt because she was single and worked full-time at a new job. The birth mother testified that she lived in Brooklyn, New York with the birth father and two of their eight children, aged 7 and 11; admitted to a drug problem when the child was born, and was thus neither emotionally nor physically prepared to care for her; and that at the time of the proceeding, she was in a methadone maintenance program in New York six days a week and was not using other drugs. During the proceeding, there was also testimony by a DHS caseworker indicating that although S.L.C. indicated she wanted to care for her daughter, she did not follow up. Although the caseworker testified as to how the child was presently thriving, she had not undertaken a home study of the birth mother's home in New York. The trial court concluded that the termination of parental rights would be in the best interests of A.S.C.

2. The Appeal of the First Termination of Parental Rights Order
After the trial court decided in favor of terminating parental rights in the best interests of the child, the birth parents appealed, arguing that the decision was not supported by clear and convincing evidence, that there was no evidence of parental unfitness, and that there were no reasonable prospects for the child's adoption. This court agreed with appellants and reversed and remanded, finding that termination of parental rights was premature although "the case is a close one." In re A.S.C., 671 A.2d 942, 944 (D.C.1996). Key to this court's finding that such a drastic measure was premature was the fact that DHS had not undertaken a home study of the birth parent's residence in New York; the parents testified to not having used drugs since April 1991; both parents were participating in a methadone maintenance program; there were social workers in New York that could assist them; they appeared to have a home with ample space; and the child remained in institutional care with no prospects for adoption. However, we qualified our conclusion by stating that "[t]he circumstances might be quite different if the child's prospects for adoption were greater or a prospective placement had been shown," id. at 951, and we left open the possibility that a second termination of parental rights motion could be filed in the event of "a material change in circumstances affecting the child's best interests." Id. at 951 n. 15.

3. The Petition for Adoption and the Second Termination of Parental Rights Motion
During the course of the first appeal, appellee F.E.S. filed a petition for adoption and, in January 1997, the guardian ad *1222 litem filed a second motion for termination of parental rights. These two cases were subsequently consolidated for trial. In November 1997, the trial court entered an Order to Show Cause pursuant to D.C.Code § 16-304(e) as to why the birth parents' consents to the adoption should not be waived based on their abandonment of the child and their failure to provide her with financial support.[2] The trial court decided that the show cause hearing would serve as an alternative hearing approach to this case since a termination of parental rights proceeding and a show cause hearing under § 16-304(e) are the functional equivalent. The show cause hearing took place at the time of the consolidated trial in February 1998.
In its October 1998 order, the trial court ruled that the evidence presented at the show cause hearing was more than adequate to establish clear and convincing evidence that the termination of parental rights would be in the best interests of the child or, in the alternative, allowed for the waiver of their consents to the adoption. Specifically, the trial court found that both birth parents continued to struggle with cocaine use;[3] neither parent had an adequate understanding of the child's medical needs,[4] nor had they undergone the training required for her care;[5] the birth parents' lifestyles did not indicate that they had the discipline to provide the child with the care and monitoring she required;[6] the birth parents did not have stable employment or income to provide for a third child with A.S.C.'s degree of medical and developmental needs;[7] and neither parent had demonstrated a sustained interest in the child over the nine years of her life by visiting her or contacting DHS.[8] The trial *1223 court's findings are echoed in the January 1995 findings made by the New York State Department of Social Services in their home evaluation of appellants.[9] Moreover, the trial court found that circumstances had changed significantly since the previous termination of parental rights proceeding in 1991, particularly in light of the filing of the petition for adoption by F.E.S., who had cared for her since 1993, had been willing to adopt her since 1994, and had the necessary training to provide for A.S.C.'s medical needs.
The trial court concluded that the birth parents were withholding their consents to the adoption contrary to the best interests of the child, dismissed as moot the termination of parental rights motion, and requested that DHS and the adoption social worker proceed with the investigation required for the adoption case. Subsequently, F.E.S.'s new husband, P.S., was added to the adoption petition, and the final decree of adoption was entered in August 1999. Appellants now appeal.

II.
Appellants argue that the trial court abused its discretion in concluding that they withheld their consent to the adoption contrary to the best interests of the child based on the following: the failure of DHS to facilitate the reunification of the family; the natural mother's willingness to undergo training in order to provide for A.S.C.'s medical needs; the failure of the trial court to recognize that the birth parents were prevented from visiting the child due to financial constraints, not disinterest; the lack of any evidence showing that the natural parents' drug use has interfered with the care of the two children they are presently raising; and the belief that A.S.C. would gain a great deal by residing with siblings of her own heritage.
Although the consent of the natural parents is ordinarily required prior to an adoption, D.C.Code § 16-304(a) (2001), "[t]he court may grant a petition for adoption without ... [parental consent], when the court finds, after a hearing, that the consent or consents are withheld contrary to the best interest of the child." See id. § 16-304(e); In re D.R.M., 570 A.2d 796, 803 (D.C.1990). In our cases, we have held that a determination as to whether the natural parents are withholding consent contrary to the best interests of the child pursuant to D.C.Code § 16-304(e) requires weighing the factors considered in termination of parental rights proceedings pursuant to D.C.Code § 16-2353(b) (2001). In re A.W.K., 778 A.2d 314, 325 (D.C. 2001); In re L.W., 613 A.2d 350, 356-57 (D.C.1992); In re D.R.M., supra, 570 A.2d at 804-05; In re H.R., 581 A.2d 1141, 1156-57 (D.C.1990). The § 16-2353(b) factors are as follows:
(1) the child's need for continuity of care and caretakers and for timely integration into a stable and permanent home, taking into account the differences in the development and the concept of time of children of different ages;
(2) the physical, mental and emotional health of all individuals involved to the *1224 degree that such affects the welfare of the child, the decisive consideration being the physical, mental and emotional needs of the child;
(3) the quality of the interaction and interrelationship of the child with his or her parent, siblings, relative, and/or caretakers, including the foster parent; (3A) the child was left by his or her parent, guardian, or custodian in a hospital located in the District of Columbia for at least 10 calendar days following the birth of the child, despite a medical determination that the child was ready for discharge from the hospital, and the parent, guardian, or custodian of the child has not taken any action or made any effort to maintain a parental, guardianship, or custodial relationship or contact with the child;
(4) to the extent feasible, the child's opinion of his or her own best interests in the matter; and
(5) evidence that drug-related activity continues to exist in a child's home environment after intervention and services have been provided. . . . Evidence of continued drug-activity shall be given great weight.
A trial court's weighing of these factors in determining the best interests of the child is reviewed for abuse of discretion, In re D.R.M., supra, 570 A.2d at 803-04, and, as an appellate court, we may not "redetermine the credibility of witnesses where, as here, the trial court had the opportunity to observe their demeanor and form a conclusion." In re E.H., 718 A.2d 162, 169 (D.C. 1998).

A. The Child's Special Needs
The trial court did not abuse its discretion in concluding that the birth parents continued to struggle with cocaine addiction and had demonstrated little commitment to preparing themselves to meet the special needs of A.S.C. and, consequently, that it would be inappropriate to risk her health and very life on their stated future intentions.[10] Relying on facts similar to the ones here, we have previously concluded that such risk-taking on the part of the court when faced with a special needs child is unacceptable:
[the child] has extensive special needs which many parents of above average resourcefulness would find difficult to accommodate. The biological father loves her, but his capacity to deal with her problems is in serious question.
The father asks us to deny the adoption petition, asserting instead his own right to raise his daughter. To grant his request would mean wrenching [the child] away from the de facto parents who have loved her and successfully cared for her for almost all of her life . . . Although the father is undoubtedly a decent man whose situation evokes one's sympathy, any humane and impartial judge acting as parens patriae in [the child's] behalf would surely be loath to take the kind of risk with this child's future which the biological father is asking us to take.
In re L.W., supra, 613 A.2d at 354-55. See also In re E.H., supra, 718 A.2d at 170 (within the context of a neglect proceeding, we recognized that "an individual who is able to parent a child with advanced or average skills may nevertheless be unable to carry out the additional responsibilities required to raise a child with special needs"); In re C.E.W., 541 A.2d 625, 626-27 (D.C.1988) (with respect to special *1225 needs child born with fetal alcohol syndrome and fetal hydantoin syndrome, clear and convincing evidence supporting termination of parental rights was established based on findings that the natural parents both abused alcohol; the father was unable to remain consistently employed; the mother managed only sporadic visits over a four-year period; and the father had shown a "pronounced lack of understanding of [the child's] limitations and needs").

B. Agency Failure
Appellants also argue that DHS made no attempts to facilitate visits between A.S.C. and her natural parents, and that the agency determined that adoption was the goal in this case early on and, consequently, showed no commitment to reunification. Although this court has recognized that agency recommendations that create a presumption in favor of adoption are problematic when it becomes almost impossible to overcome this presumption irrespective of the efforts made by the natural parents, In re D.R.M., supra, 570 A.2d at 807, there is no evidence that such a presumption was at work here. Moreover, while agencies have an obligation to provide services and facilitate family reunification, this court has found no statutory requirement that such agency action is a "condition precedent" to the commencement of a termination of parental rights proceeding since the "overriding consideration is the best interests of the child." In re A.C., 597 A.2d 920, 924-26 (D.C.1991).

C. Other Issues
Appellants additionally argue that there was insufficient evidence to indicate that their failure to visit A.S.C. was due to lack of interest rather than a lack of financial means; there was no evidence that the natural parents' drug use has interfered with the care of the two children they are presently raising; and that A.S.C. would gain a great deal by residing with siblings of her own heritage. The trial court was not clearly erroneous in finding that the birth parents appeared to spend relatively large sums on gifts for the two children presently residing with them, funds that could have been applied to making visits to see A.S.C. With respect to the irrelevance of their drug use on the upbringing of the two other children, as discussed above, the trial court did not abuse its discretion in concluding that it would be inappropriate to equate the care required for a child with special needs such as A.S.C. with the care of children who have no such needs.
The trial court also addressed the natural parents' concern over the fact that the prospective adoptive parents here are Caucasian while the child is African American. We have held that race is simply a factor that may be considered by the trial court in the process of determining the best interests of the child. In re D.I.S., 494 A.2d 1316, 1326-27 (D.C.1985). Thus, the trial court did not abuse its discretion in concluding that race is merely one factor to be considered when evaluating the best interests of the child, and that "such considerations pale into insignificance when we compare the health needs of this child and keeping her alive."

III.
As grounds for reversal of the trial court's Final Decree of Adoption, appellants argue that, during the show cause hearing, they were denied their constitutional right to confront and cross-examine petitioners, or to present evidence challenging their fitness as prospective adoptive parents; there is no evidence on the record of bonding between appellee F.E.S. and the child; there is no evidence of the suitability of F.E.S.'s home after her marriage to P.S.; and that there is no showing that emotional harm would result if the *1226 child were to be removed. These objections are without merit.
This court has held that the purpose of the hearing required by D.C.Code § 16-304(e) is to determine whether the birth parents are withholding their consents to an adoption contrary to the best interests of the child by focusing on their fitness using the D.C.Code § 16-2353(b) factors relied upon in termination of parental rights proceedings. In re A.W.K., supra, 778 A.2d at 325-26. We recognized that such a hearing is "obviously intended by statute to be something less than a plenary hearing on the adoption," id. at 325, and concluded that a trial court "act[s] permissibly in considering whether the birth parents are withholding consent contrary to the best interests of [the child] without a full consideration of the particular adoption which was being sought." Id. at 326. Thus, the trial court did not abuse its discretion in rejecting appellants' attempt to introduce matters relevant to the adoption proceeding into the § 16-304(e) hearing by shifting the focus away from the birth parents to the suitability of the adoptive parents. For the same reason, appellants' objection to the timing of the appearance of petitioner P.S. as a prospective adoptive parent and their other claims must fail.
Accordingly, the order of the trial court is
Affirmed.
NOTES
[*] The disposition of this case was originally issued as a Memorandum Opinion and Judgment on December 11, 2001, and is now being published at the request of appellees. We note that this court has made a number of clarifying additions and modifications.
[1] In the original adoption petition prior to her marriage, F.E.S. is indicated by the initials F.E.L. or F.L.
[2] D.C.Code § 16-304(e) provides that "[t]he court may grant a petition for adoption without... the consents [of the birth parents] ... when the court finds, after a hearing, that the... consents are withheld contrary to the best interest of the child."
[3] The birth mother tested positive for cocaine in January 1997 and on the first day of trial in February 1998. The trial court expressed doubt that these were the only two incidents of relapse. With respect to the birth father, he tested positive for cocaine on multiple occasions between January and July 1997.
[4] During a home study visit to the birth parents' home in Brooklyn, New York pursuant to the Interstate Compact for the Placement of Children (ICPC), the birth father informed the home study caseworker that he believed his daughter's medical condition was being exaggerated, and that he did not intend to participate in the care of the child, leaving her care exclusively to his wife.
[5] Expert testimony from a pediatric pulmonologist indicated that the child would require special care for her survival since she continues to suffer from pulmonary disease, which requires a great effort on her part to breathe and which places her at a high risk of life threatening complications if she should suffer from pneumonia or an asthma attack. A caretaker for the child would be required to do the following to ensure her health and survival: administer aerosols on a daily basis, drain her chest when necessary, administer antibiotics and steroids to treat her lung disease, and constantly monitor her for signs of respiratory distress or infection. In addition, a caretaker would be required to undergo special training to attend to her needs.
[6] Also significant to the trial court was the fact that the birth parents were smokers. The expert testified that the child's exposure to secondhand smoke would trigger the development of chronic bronchitis and emphysema. Consequently, she required an environment with minimal dust, no smoking, no use of aerosols near her, and minimal molding.
[7] The birth father had not worked for four years, and the birth mother had not worked for five years. Consequently, both relied on public assistance for most of their income. The birth father admitted that his difficulty with finding permanent employment since 1989 stemmed from his drug problem.
[8] The trial court also noted that the birth parents spent relatively large sums on gifts for the two children residing with them when these funds could have contributed to meeting transportation costs to visit A.S.C. in the District of Columbia. The birth father's last visit with his daughter was in 1990, and the birth mother's last visit was in 1991.
[9] The New York authorities did not approve the placement of the child with her parents based on the following findings: the birth parents were not prepared to address the child's special medical needs; there was inadequate living space to accommodate the child and her medical needs; the parents had prior and current drug problems that raised serious concerns; and the parents were currently caring for two children and, thus, the addition of a third child with A.S.C.'s medical problems would expose her to risk.
[10] In his 1998 order, Judge Burnett wrote that he had "listened carefully to both the mother's testimony, and the father's testimony when he finally appeared ... and testified, and this Court was left with the gnawing feeling that to place this child with them in their residence in New York would be playing `Russian Roulette' with her life."