In re Petition of J.B.N. and T.F.N.,
L.H. and D.P., Appellants.

Nos. 06–FS–148, 06–FS–149, 06–FS–150, 06–FS–151, 06–FS–152, 06–FS–153, 06–FS–154, 06–FS–155, 06–FS–823, 06–FS–824, 06–FS–825, 06–FS–826, 06–FS–861, 06–FS–862, 06–FS–863, 06–FS–864.

District of Columbia Court of Appeals.

Argued Dec. 8, 2006.

Decided Feb. 15, 2007.

Daniel K. Dorsey, appointed by the court, with whom Melanie R. Brady was on the brief, for appellant D.P.

T. Michael Barry filed a statement in lieu of brief for appellant L.H.

Marion E. Baurley, Washington, for appellees J.B.N. and T.F.N.

Karen A. Weiss, Assistant Attorney General, with whom Robert J. Spagnoletti, Attorney General at the time the brief was filed, Todd S. Kim, Solicitor General, and Edward E. Schwab, Deputy Solicitor General, were on the brief, for appellee.

Donna Beasley, Guardian Ad Litem, filed a statement in lieu of brief for appellee.

Before FISHER, BLACKBURNE–RIGSBY and THOMPSON, Associate Judges.

BLACKBURNE–RIGSBY, Associate Judge:

■ In this appeal, birth parents L.H. and D.P. seek reversal of the trial court's [1] decision finding that they acted contrary to the best interest of their four children by withholding their consent to the childrens' adoption by suitable and loving adoptive parents, who have cared for the children since 1996. Although the mother, L.H., commendably engaged in drug rehabilitation, with some periods of success, over the course of the childrens' *nine-year* involvement in the foster care system, we discern no error in the trial court's refusal to deny the children a permanent adoptive home in order to allow L.H. additional time to

---

1. D.C. Superior Court Judge Odessa Vincent reviewed the decision of Magistrate Judge Julie Breslow pursuant to Super. Ct. Gen. Fam. R. D(e). For purposes of this opinion, references to the "trial court" or the "trial judge" are to Judge Vincent's December 29, 2005 decision affirming the Magistrate Judge's Findings of Fact and Conclusions of Law and Order waiving the consent of appellants to adoption by petitioners. Because the Magistrate Judge's Order waiving a birth parent's consent to adoption was not a final order appealable directly to this court, it is Judge Vincent's order that we review. *See In re S.J.,* 772 A.2d 247, 248 (D.C.2001) ("An order waiving a birth parent's consent to adoption is not a final order and may not be appealed until the adoption proceedings have been concluded. The reason is that only upon a final decree of adoption are the 'rights and duties' of natural parents terminated.") (citation omitted). However, we incorporate by reference herein the Magistrate Judge's factual findings in her April 4, 2005 decision, which were affirmed by Judge Vincent and are included as part of the record on appeal.

prove her ability to parent. Similarly, D.P.'s laudable efforts within the last two years to establish a bond with his children, after being absent for most of their lives due to numerous periods of incarceration, do not negate our conclusion that the trial court properly exercised its discretion in terminating his parental rights. We *affirm*.

## I. Factual and Procedural Background

Appellants, D.P. and L.H., are the birth father and mother, respectively, of four children, D.H., M.H., E.H., and T.H.[2] D.H. and M.H. were first removed from the home of L.H. in 1996 at the ages of three and two respectively, and placed in shelter care, amid allegations that they were without proper parental care and supervision due to their mother L.H.'s drug use. In 1996, D.H. and M.H. were both placed in the home of the petitioners, J.B.N. and T.F.N. At this time, D.P. was incarcerated, but received notice of his children's placement in foster care. On October 6, 1996, E.H. was born and was subsequently removed from L.H.'s care on July 19, 1997, and placed with his maternal uncle, J.H.[3]

In November 1999, D.H. and M.H. were placed back with L.H. under protective supervision, and E.H. joined them in June 2000. They remained with L.H. without incident until September 3, 2002, when all of the children were once again removed (along with their newborn sister T.H., born to L.H. and D.P. on March 7, 2002) amid

new allegations of neglect, due to renewed substance abuse and lack of proper supervision by L.H., who had relapsed. In 2002, D.H., M.H., E.H., and T.H. were again placed with J.B.N. and T.F.N., where they have remained ever since.

On September 18, 2003, J.B.N. and T.F.N. filed petitions to adopt all four children, to which L.H. and D.P withheld their consent. On February 25 and March 14, 2005, a show cause hearing was held pursuant to D.C.Code § 16–304(d), (e) (2001), to determine whether L.H.'s and D.P.'s consent to the adoption of their children should be waived. The petitioner, J.B.N.; the mother, L.H.; the father, D.P.; the maternal uncle, J.H.; the maternal grandmother, B.H.; and CFSA social worker, Arnyis Whitlock–Woodberry, testified at the show cause hearing. The Magistrate Judge, in an Order dated April 4, 2005, concluded that there was clear and convincing evidence that the parents' withholding of consent was contrary to the children's interests. The trial court affirmed the Magistrate Judge's Order on December 29, 2005 pursuant to Super. Ct. Gen. Fam. R. D(e). A Final Decree of Adoption was issued on June 16, 2005, and D.P. filed a timely notice of appeal on June 27, 2005, in which L.H. joined.[4]

### A. The Mother's Substance Abuse and Criminal History

At the show cause hearing, the mother, L.H., admitted to a long history of drug abuse and instability, which led to her

---

2. D.H. was born July 1, 1993; M.H. was born August 6, 1994; E.H. was born October 6, 1996; and T.H. was born March 7, 2002. L.H. has a fifth child, C.H., who resides with her and is not in the neglect system and is not a party to this appeal.

3. On January 28, 1999, the neglect court changed D.H.'s and M.H.'s permanency goals to adoption and E.H.'s permanency goal to legal custody with his maternal uncle, J.H.

4. Appellee, the District of Columbia, initially argued in its brief that appellant, D.P., failed to timely file a notice of appeal and, thus, his appeal should be dismissed for lack of jurisdiction. However, appellee realized that this argument was in error and withdrew the argument in a correspondence submitted to the court on December 5, 2006.

children being removed from her care. Specifically, L.H. testified that she began using crack cocaine and PCP in 1985. As a result of her addiction, she was involved in several instances of criminal activity, incarceration, and physical abuse.[5] L.H. sold drugs to support her addictions and was arrested for drug-related crimes in October 1986 and July 1989. As a result of these arrests, L.H. was incarcerated for three years and spent three years and six months on probation.[6] L.H. testified that she used drugs during her pregnancies, despite knowing that this could harm her children and cause medical problems for them.

Despite L.H.'s long history of drug abuse, the record also shows, and the trial court explicitly acknowledged, that L.H. has taken steps to free herself from her addiction.[7] L.H. began this process of recovery in 1996 after her children were removed from her care with an enrollment in a 28–day drug treatment program at Kerrick Hall. In November 1998, L.H. entered the House of Ruth Program, which provided her with housing and drug treatment. In August 1999, L.H. transitioned into the House of Ruth's reunification program, which made it possible for at least one of her children to be placed with her. In 1999, the trial court allowed E.H. to live with L.H., and in 2000, allowed D.H. and M.H. to live with her as well. During this time that L.H. resided at the House of Ruth, CFSA provided L.H. with services to assist her in caring for her children, and also monitored her progress in the program. These services included drug treatment referrals, rental and monetary assistance, clothing vouchers, mentoring services for her children, and in-home family counseling.

Despite her efforts at treatment and services from CFSA, L.H. relapsed from 2001–2003, shortly after moving into her own apartment with her children. During this two year period, D.H., M.H., E.H., and T.H. were once again removed from her care and placed into foster care with the petitioners J.B.N. and T.F.N. After the children were removed from her care, L.H. became homeless from September 2002 to September 2003 and continued to use drugs. In a third attempt to overcome her drug addiction, L.H. moved into the Naomi Transformation Center, a housing and drug treatment program, in September 2003. L.H. testified that at this point, she finally started to turn things around, and that her time at the center was her "phoenix rising."

At the time of the 2005 show cause hearing, L.H. was living in her own one bedroom apartment in Washington, D.C. with C.H., her youngest daughter, who is not subject to this appeal. L.H. was also working as a pizza delivery person, and estimated her yearly income to be between $15,000 and $16,000.[8] At the show cause hearing, L.H. testified that she had not used drugs or alcohol for approximately eighteen months.

## B. The Father's Substance Abuse and Criminal History

The father, D.P., also appealed and testified at the show cause hearing that he and

---

5. L.H. admitted to being homeless at one point in her life, and being a victim of many crimes, including sexual assault, stabbing, and pistol whipping.

6. L.H.'s convictions include possession of PCP, possession with intent to distribute cocaine, and escape.

7. As of the date of the show cause hearing, L.H. had been sober for eighteen months.

8. This figure included wages from her job, food stamps, supplemental security income in connection with a knee condition, and Temporary Assistance for Needy Families ("TANF").

L.H. met in 1995 and have dated sporadically ever since. They had a volatile relationship, and D.P. was arrested for assaulting L.H. in 2003. As a result, D.P. was incarcerated until September 2004, and then resided as an inpatient at a drug treatment program as part of his sentence, until December 2004. At the time of the 2005 show cause hearing, D.P. was still on probation in connection with his offenses.

D.P. also admitted to a long history of drug abuse. D.P. testified that he began using PCP and marijuana in the seventh or eight grade, and began using crack cocaine in the ninth grade. As a result, he was incarcerated for significant periods of his life since 1981, largely due to substance abuse. D.P. admitted that he has never lived on his own, and never held a paying job until 2005.

At the show cause hearing, D.P. also testified that prior to 2004, he has had little contact with his children and that he had not been able to build relationships with them due to his incarceration and chaotic lifestyle. However, at the time of the hearing, D.P. had been free of drugs for seven or eight months, living with his mother, and working his first paying job. As a result, D.P. had become a regular fixture in his children's lives since the fall of 2004.

## II. Applicable Law

■ In reviewing decisions of the trial court in neglect cases, "our task is to ensure that the trial court has exercised its discretion within the range of permissible alternatives, based on all relevant factors," and then to consider whether the decision

is consistent with applicable legal principles. *In re Am. V.,* 833 A.2d 493, 500 (D.C.2003) (citation omitted). The determination of whether a birth parent's consent to the adoption of a child has been withheld contrary to the child's best interest is confided to the trial court's sound discretion. *In re J.G.,* 831 A.2d 992, 999 (D.C.2003) (*citing In re Petition of P.S.,* 797 A.2d 1219, 1223–24 (D.C.2001)). We must determine whether the trial court's decision to terminate a parent's rights is supported by clear and convincing evidence, and we must be satisfied that "the possibility of an erroneous judgment does not lie in equipoise between the two sides." *In re J.G., supra,* 831 A.2d at 999 (citation omitted). This high burden is constitutionally mandated because an adoption over the natural parent's objection effectively terminates that parent's interest vis-a-vis the child against his or her will. *In re J.D.W.,* 711 A.2d 826, 832 (D.C.1998) (finding that a natural parent enjoys constitutional protections that may not be overridden without careful examination of factors designed to ascertain the best interests of the child).

■ A determination as to whether the natural parents are withholding their consents[9] to adoption contrary to a child's best interest requires the weighing of the factors considered in termination of parental rights proceedings, pursuant to D.C.Code § 16–2353(b) (2001). *See In re Petition of P.S., supra,* 797 A.2d at 1223. These factors are as follows:

(1) the child's need for continuity of care and caretakers and for timely inte-

---

9. D.C.Code § 16–304(e) provides that the court may grant a petition for adoption without any of the consents specified in this section, when the court finds, after a hearing, that the consent or consents are withheld contrary to the best interest of the child. *See also In re J.G., supra,* 831 A.2d at 1001 ("Not-

withstanding the presumption in favor of the birth parent, however, we have repeatedly held that the parent's rights may and must be overridden when such a drastic measure is necessary in order to protect the best interests of the child.").

gration into a stable and permanent home, taking into account the differences in the development and the concept of time of children of different ages;

(2) the physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive consideration being the physical, mental and emotional needs of the child;

(3) the quality of the interaction and interrelationship of the child with his or her parents, siblings, relatives, and/or caretakers, including the foster parents;

(4) to the extent feasible, the child's opinion of his or her own best interests in the matter; and

(5) evidence that drug-related activity continues to exist in a child's home environment after intervention and services have been provided . . . .

## III.  Analysis

■  We disagree with appellants' contention that the trial court abused its discretion by prematurely granting the adoption petition over their objection.  On its face, L.H. and D.P.'s plea for a little more time to prepare themselves to effectively parent their children, appears compelling and reasonable, given their considerable efforts to address their respective addictions and other barriers to parenting their children.  However, the legal standard by which we are bound to review this case is "the best interests of the child." [10]  *See In re S.C.M.*, 653 A.2d 398, 405 (D.C.1995).  Based on our analysis of the statutory factors and applicable case law, we conclude that the trial court did not abuse its discretion.

The first statutory factor we must consider is the children's need for continuity of care and caretakers and for timely integration into a stable and permanent home.  D.C.Code § 16–2353(b)(1).  The children's birth father, D.P., contends that this factor should weigh in favor of the appellants since, except for D.H., the other children have not been in foster care that long, and in any event, they have been in the stable environment of petitioners' home and have not been shuffled between numerous foster homes.  However, D.P.'s characterization of the childrens' placements in the neglect system is misguided.  Timely integration into a stable and permanent home is arguably the most important factor when considering the best interests of the child.

■  In viewing the evidence in a light most favorable to the petitioners, we conclude that the evidence supports the trial court's finding that adoption of the H children by the petitioners satisfies their need for continuity of care and stability.  D.H. and M.H. have either been in foster care or under court protective supervision continually since 1996.  Similarly, E.H. has been in either foster care or under court protective supervision continually since 1997, and T.H. has been in either foster care or under court protective supervision continually since 2002.  The trial court found, based on the testimony at the show cause hearing, that the H children have become a part of the petitioners' family and have developed relationships with them.  Petitioners and the H children operate as a family and attend church together, go vacationing, and attend family functions.  The petitioners have been placement resources for the H children since the first time they were removed from L.H.'s home in 1996, and have been the one stable factor in their lives ever since.  *See, e.g., In re J.L.*, 884 A.2d 1072, 1078 (D.C.2005) (holding that the trial

---

**10.**  Perhaps, if our guiding legal principle on appeal were "the best interests of the parents," appellants' plea would indeed be reasonable.

judge did not abuse his discretion in concluding that this statutory factor weighed in favor of waiving the mother's consent to adoption because the adoptive couple provided the children with a stable and permanent family home for nearly four years, whereas, despite sincere efforts, the biological mother had not shown that she can stay sober, and this demonstrated an inability to provide for the children's physical, mental, and emotional needs).

On the other hand, neither the mother, L.H., nor the father, D.P., has been able to provide their children with the same type of stability and permanence displayed by petitioners. Both L.H. and D.P. have admitted to their protracted history of substance abuse. Moreover, L.H. has a long history of leaving her children with unwilling and unable caretakers and when offered a second chance to care for her children in 1999 and 2000, L.H. relapsed and again left her children with unwilling caretakers. Viewing the record before us in the light most favorable to the government, as we must, the trial court did not abuse its discretion by considering L.H.'s and D.P.'s history of neglect and instability, and determining that they were withholding consent contrary to the best interests of their children. We discern no abuse of discretion in the trial court refusing to place the children back in L.H.'s home and subject them to a degree of uncertainty and the risk that such neglect would occur again. This is a gamble that the court should not make. *In re L.L.,* 653 A.2d 873, 887 (D.C.1995) (courts will not gamble with a child's future) (internal quotations and citations omitted).

▆ The second factor we consider is the physical, mental, and emotional health of all parties involved. D.C.Code § 16–2353(b)(2). The trial court found that this factor also weighed in favor of the petitioners and concluded that there were no compelling physical or mental health issues regarding the parties involved. Although L.H. has problems with her knees and D.P. suffers some physical health problems, there is no indication that these conditions have any impact on their ability to parent. Further, the parents do not dispute that the petitioners have been able to meet all of the children's physical, mental, and emotional needs. Because the evidence supports these findings, they should not be disturbed. *See, e.g., Hill v. United States,* 627 A.2d 975, 979 n. 3 (D.C.1993) ("We give considerable deference, as we must, to these factual findings, and we may not disturb them unless they are plainly wrong or without evidence to support them.") (*citing* D.C.Code § 17–305 (2001) (citation omitted)).

▆ The third factor to be considered is the quality of the interactions between the parties involved. D.C.Code § 16–2353(b)(3). None of the parties dispute the fact that the children love their parents, as well as the petitioners. The record reveals that L.H. and D.P. have a "warm and respectful relationship" with the petitioners. As between the H children and the petitioners, it is undisputed by all parties that this relationship has been altogether favorable. The evidence is clear that the petitioners' home exudes a sense of warmth, that the children are happy living there, and that they affectionately refer to the petitioners as "mom" and "dad."

Additionally, as between the H children and their parents, the record reveals that the quality of the interactions between them has improved. However, D.P. admitted that his relationship with his children was fragmentary until September 2004, and that he did not have much of a relationship with his children before this time. The trial court found that this third factor weighed in favor of the petitioners. Be-

cause the record supports each of these findings, we find no abuse of discretion by the trial court in determining that the quality of the interactions between the parties involved is satisfactory.

■ The fourth statutory factor to be considered is the children's opinion of their best interests. D.C.Code § 16–2353(b)(4). Although none of the H children testified at the show cause hearing, the Magistrate Judge looked to the behavior of the children, as described by other witnesses at the show cause hearing, and adduced that while the children enjoyed visiting with their parents, they were well adjusted to the petitioners' home. In evaluating this fourth factor, the trial court properly considered the testimony of other witnesses who had directly observed the children. While "it is preferable for judges to hear directly from the children involved in such proceedings if it is at all feasible to do so," *In re J.L., supra,* 884 A.2d at 1080 (internal citation and quotation marks omitted), "[t]he statute does not say the judge must derive this opinion even partly from questioning of the child" himself. *In re T.W.,* 623 A.2d 116, 117 (D.C.1993); *see also In re I.B.,* 631 A.2d 1225, 1232 (D.C.1993).

■ The fifth and final factor we consider is whether there was continued drug use in the children's home environment. D.C.Code § 16–2353(b)(5). We have held that the phrase "home environment" refers to the home where a child would reside if returned to his or her mother. *See In re D.R.,* 673 A.2d 1259, 1264 (D.C.1996). Because the record supports the fact that both L.H. and D.P. are currently drug free, we accept the trial court's finding that this factor should not be allocated any weight.[11] *See Hill, supra,* 627 A.2d at 979 n. 3.

In summary, a weighing of the statutory factors does not support appellants' contention that the adoption decree was granted prematurely or improperly over their objection. L.H. contends that she should have been given more time to show that she would abstain from drugs and be able to function as a good parent.[12] L.H.'s continuous contact with her children and her numerous efforts at drug rehabilitation make the facts of this case somewhat more compelling than previous cases we have decided where birth parents sought additional time to address an addiction or other issue impeding their ability to parent. *Cf. In re W.E.T.,* 793 A.2d 471, 478 (D.C. 2002) (court upheld adoption decree where the child's natural mother had not involved herself in the child's life to any extent and returning the child to the mother's care would involve numerous risks and uncertainties about the mother's ability to stay off drugs and maintain a home); *In re Petition of P.S., supra,* 797 A.2d 1219 (finding that it would be inappropriate to risk a child's health and very life on the future intentions of parents who continued to struggle with cocaine addiction and had demonstrated little commitment to prepar-

---

11. Although D.P. argues that the court abused its discretion by not weighing heavily D.P.'s drug free period, his argument lacks merit. As the appellees pointed out in their brief, D.C.Code § 16–2353(b)(5) does not require that the court give weight to a period of "sobriety," only to evidence of continued drug activity.

12. L.H. did not request such a continuance at trial and therefore it is questionable whether appellant preserved this claim for appellate review. However, we address the issue on its merits. *See Williams v. Gerstenfeld,* 514 A.2d 1172, 1177 (D.C.1986) ("Matters not properly presented to a trial court will not be resolved on appeal. A court deviates from this principle only in exceptional situations and when necessary to prevent a clear miscarriage of justice apparent from the record.").

ing themselves to meet the special needs of the child); *see also In re L.L., supra,* 653 A.2d at 881.

In the instant case, L.H., in particular, has maintained an ongoing relationship with her youngest child and has taken other steps to prepare herself to be able *one day* to care for all of her children on her own. However, we have repeatedly rejected the "wait and see approach" as contrary to the best interests of the child. In *In re J.G., supra,* we stated:

> Notwithstanding the presumption in favor of the birth parent, however, we have repeatedly held that the parent's rights may and must be overridden when such a drastic measure is necessary in order to protect the best interests of the child. It is the court's first duty ... to protect [a child] from any unwarranted danger of harm. Furthermore, there is a strong public policy, enhanced by federal legislation, disfavoring the protracted retention of children in foster care, and a "wait and see" option indefinitely deferring adoption or termination of parental rights (leaving a child in "legal limbo" for the foreseeable future) is inappropriate where a birth parent's ability to reunite with the child within a reasonable time is entirely speculative.

831 A.2d at 1001 (internal quotations and citations omitted). We have similarly held in other cases that the trial court did not abuse its discretion in holding that the birth parents had been given sufficient time to attempt reunification with their children.[13]

■ The H. children have been in foster care for almost a decade. The trial court considered L.H.'s most recent success in addressing her drug abuse, but the court also refused to discount her past actions in predicting her future behavior. We conclude that the trial court did not err in looking to L.H.'s past actions to predict her future ability to care for her children. *See, e.g., In re L.L., supra,* 653 A.2d at 881 ("Parental unfitness is a personal characteristic which, ordinarily, does not vanish overnight ....") (citation omitted).[14] Similarly, the trial court refused to ignore D.P.'s criminal and drug use history, even while recognizing his efforts to put his life back on the right track. Although we commend both L.H. and D.P on their recent attempts to straighten out their lives, it is the best interests of the H children that is our paramount concern. As such, we cannot adopt the "wait and see approach" that L.H. and D.P. suggest.

In conclusion, we discern no abuse of discretion by the trial court in terminating L.H.'s and D.P.'s parental rights over their objection and allowing the children to be adopted by the petitioners, who have cared for them nearly all of the last ten years.

---

**13.** *See In re W.E.T., supra,* 793 A.2d at 478; *In re Petition of P.S., supra,* 797 A.2d 1219; *In re L.L., supra,* 653 A.2d at 881. However, although we have affirmed the decision to grant a biological parent additional time to attempt reunification with their children and prove their ability to parent, we did so in limited circumstances, realizing that leaving a child in "legal limbo" for the foreseeable future is inappropriate. *See, e.g., In re H.B.,* 855 A.2d 1091, 1096–1097 (D.C.2004) (finding no abuse of discretion by the trial court in granting a six-month stay in an adoption proceeding where the court was concerned *pri-* marily about the social worker's failure to keep adequate records of his meetings, which ultimately provided the mother the chance to demonstrate her fitness as a parent, which she was unable to do by the time of the expiration of the stay).

**14.** For example, in the context of wife-beating, we have stated that "a [husband's] past conduct is important evidence—perhaps the most important—in predicting his probable future conduct." *Cruz–Foster v. Foster,* 597 A.2d 927, 930 (D.C.1991).

Accordingly, the decision of the trial court is hereby

*affirmed.*