**In re J.C.F. & H.A.Z.; J.A.C., Appellant.**

**Nos. 12–FS–718, 12–FS–1157.**

District of Columbia Court of Appeals.

Argued Dec. 13, 2012.
Decided Aug. 15, 2013.

Jennifer A. Renton for appellant.

Sogand Zamani for appellees J.C.F. and H.A.Z.

Irvin B. Nathan, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, Donna M. Murasky, Deputy Solicitor General, and Stacy L. Anderson, Assistant Attorney General, filed a statement in lieu of brief, for the District of Columbia.

Before GLICKMAN and BLACKBURNE–RIGSBY, Associate Judges, and NEBEKER, Senior Judge.

PER CURIAM:

These appeals arise from a father's challenge to the adoption of his child by the child's step-father with the consent of the mother. After the father withheld his consent, the trial court found by clear and convincing evidence that the father was doing so contrary to the child's best interests. The trial court entered an order waiving the father's consent and entered a final decree granting the adoption. Discerning no abuse of discretion, we affirm.

## I.

On July 6, 2011, co-appellee J.C.F. (the step-father), joined by co-appellee H.A.Z. (the mother), filed a petition to adopt S.L.Z. (the minor child). Appellant J.A.C. (the father) opposed the adoption. A two-day trial followed. The salient facts, as found by the court based on the credited testimony of the witnesses and other evidence introduced at trial, are as follows.

J.A.C. and H.A.Z. were married in June 2001 in Louisiana, and moved to the District of Columbia in 2006. At the time, J.A.C. was employed by the federal government and was earning approximately $150,000, while H.A.Z. worked as a school counselor at an elementary school. S.L.Z. was born on October 19, 2008.

The relationship between the mother and father, however, was volatile, as evidenced by J.A.C.'s abusive behavior towards his wife both during and after the pregnancy. For example, while H.A.Z. was approximately four weeks pregnant, J.A.C. pushed and held his wife in a chokehold, then knocked her to the ground and attempted to put her head in a toilet bowl. Several weeks later, J.A.C. kicked his wife in the ribs after she refused to make him a sandwich. When H.A.Z. was five months pregnant, she was driving over a bridge with J.A.C. when he hit her on the ear with his mobile phone, causing her to swerve off of the road.

Following the birth of S.L.Z., the father's violent tendencies did not subside. A few months after S.L.Z. was born, J.A.C. yanked his wife's hair, shoving her. J.A.C. at one point spat on his wife at her place of employment. In March 2009, J.A.C. unannounced arrived at the marital home, attempted to engage in sexual intercourse with his wife, and when rebuffed, pushed her against a wall and yanked her hair so hard that a wad of hair came off of her head. Following this incident, H.A.Z. called the police and received a temporary protection order.[1] In lieu of proceeding in court, which H.A.Z. feared would jeopardize J.A.C.'s employment, H.A.Z. and J.A.C. entered into a no-contact agreement. However, J.A.C. repeatedly violated the no-contact agreement. J.A.C.'s abusive-

---

1. In March 2009, J.A.C. was arrested and charged with assault of H.A.Z., for which he was eventually found guilty.

ness continued when in late 2009, he yanked the child out of the mother's arm and when, two months later, J.A.C. verbally abused the mother by referring to her and her genitalia in derogatory terms. When H.A.Z. attempted to call 911, J.A.C. pulled the phone cord out of the wall. On another occasion, following a fit of anger, J.A.C. drove away in the family car, leaving H.A.Z. without a vehicle. H.A.Z.'s parents were forced to purchase a car for their daughter.

J.A.C.'s actions caused serious financial strain for the family and prevented him from providing a substantial amount of financial support for the child. In February 2009, J.A.C. was terminated from his employment, and yet—despite repeated inquiries from the mother regarding the child's insurance coverage—he continually told H.A.Z. that the child was covered by his work insurance through 2009, which was not true. As a result, H.A.Z. incurred substantial medical debt which J.A.C. did not pay. Additionally, J.A.C. has a gambling addiction. To fund his addiction, J.A.C. resorted to, *inter alia,* theft, forgery, and bank fraud, amassing debt along the way and earning himself a growing criminal record and some time in jail. J.A.C.'s forgery of H.A.Z.'s name on checks drawn from her bank account left H.A.Z. without funds for herself and the child. She had to borrow money until the issue was resolved. Furthermore, J.A.C. failed to make his contribution to the mortgage payments, eventually resulting in the loss of the marital home. In the two years preceding trial, J.A.C. paid only $275 in child support, of which $250 was paid in March 2012, on the eve of trial. J.A.C. asserted that he received approximately three months of treatment for his gambling and was diagnosed with major de-

pressive and anxiety disorder and impulse control disorder. Although J.A.C. testified that he was cured, the court did not find it plausible that J.A.C. no longer had a gambling problem, as J.A.C. sought therapeutic help for a short period and submitted no documentation indicating that he is regularly seeking treatment, notwithstanding the fact that documents entered into evidence indicated that after J.A.C. was discharged he was to transfer to another provider for further treatment. The trial court noted that, as of the spring of 2012, J.A.C. had recently begun employment teaching a two-credit engineering course at a nearby University and was hopeful that he would receive more hours teaching in the fall of 2012.

The father's involvement in S.L.Z.'s life has been erratic and limited. In December 2008, just two months after S.L.Z. was born, J.A.C. left the mother and child and did not return full-time after that date.[2] Although J.A.C. and H.A.Z. entered into a no-contact agreement in March 2009, the terms of the agreement allowed J.A.C. to visit the child. Similarly, after J.A.C. and H.A.Z. legally separated in September 2009, the court granted H.A.Z. temporary custody and J.A.C. a reasonable right to unsupervised visitation with the child. Notwithstanding the fact that the no-contact agreement and custody order permitted J.A.C. to visit with the child, he refused to make arrangements for visitation with the child through H.A.Z. and only sporadically visited the child. For example, in June 2009, J.A.C. took the child to visit with his paternal relatives in Puerto Rico, but provided H.A.Z. with a fake reservation number, leaving H.A.Z. with no idea when the child would be returned. When visiting the child for his first birth-

---

2. J.A.C. moved to an apartment in Louisiana, where he was supposedly pursuing a doctorate degree in electrical engineering which he never completed, while H.A.Z. and the child remained in the District of Columbia.

day, J.A.C. paid little attention to the child, even falling asleep while the child was crawling, unsupervised near a flight of stairs. By February 2010, the mother had obtained a civil protection order from the court that barred J.A.C. from having visitation with the child until further court order. Thereafter, J.A.C. failed to take other steps to remain a presence in his young son's life, such as by sending pictures, letters, or gifts to his son.

J.A.C. and H.A.Z. divorced in August 2010. In the divorce and custody proceedings, the court declared the father to be unfit as a result of his mistreatment of the mother, his subordinating what is best for the child to his own desires and his erratic, unpredictable and criminal behavior, and found that the father possessed a dangerous disregard for the child's safety and security. As a result, the court granted sole physical and legal custody to H.A.Z. and denied visitation to the father. In May 2011, the court extended the February 2010 civil protection order barring the father from visiting with the child. At the conclusion of trial in the instant case, the court found that "J.A.C. does not appear to accept responsibility for his actions, casting blame on his ex-wife for his actions and others whenever it suits his needs," including by alleging that it was an attorney, rather than his own failure to make mortgage payments, that caused the house arrearages and that it was H.A.Z.'s fault that J.A.C. was caught stealing, and by failing to communicate to H.A.Z., *inter alia,* that he had been terminated by his employer in February 2009, that the child's insurance coverage was cancelled, and that J.A.C. was not making payments on the mortgage. The court further concluded that J.A.C. was not credible based on his "demeanor, testimony, his convictions, his fraud and perpetual lying," which evidence that he is "quite calculating, dishonest with himself and with the Court, and lacks insight concerning his emotional issues."

With respect to the step-father and the mother, the court made the following findings. J.C.F. and H.A.Z. met in late 2009. J.C.F. moved into a rental apartment with H.A.Z. and S.L.Z. in February 2010 (when the child was about 17 months old). They married in March 2011 (when the child was nearly two-and-a-half years old), at which point J.C.F. became the step-father of the child. J.C.F. and H.A.Z. purchased a home in August 2011. The court observed that co-appellees have a caring relationship, indicated by smiling and handholding, and that J.C.F.'s testimony and demeanor indicated his love for his wife and the child. J.C.F. is employed by the Department of Defense in a position that allows him flexibility to spend time with the child. The court also noted:

> J.C.F. apparently was smitten by [H.A.Z.] and her son. J.C.F. spends a lot of time with the minor child. J.C.F. takes the minor child to medical appointments, picks him up from daycare, and takes him to the barber's shop and dance lessons ... and other. fun activities. J.C.F. testified that as a family they do everything together. J.C.F. and his wife discuss and make decisions concerning the child together. J.C.F.'s entire family is involved with the child and they spend holidays and vacation time together. J.C.F. noted that he and the child are "two peas in a pod." J.C.F. noted that the minor child has his own room and a playroom.... J.C.F. testified that his parents and siblings and family love the child and submitted pictures of the family, J.C.F. and the minor child.

The court found that the child is bonded with H.A.Z. and J.C.F. and the three are fully integrated as a family unit.

On May 9, 2012, the trial court concluded that J.A.C. was withholding his consent to the adoption contrary to the best interests of the child and thus, entered an order waiving J.A.C.'s consent and granting the

joint petition of the step-father and mother to adopt the child. J.A.C. appealed.

## II.

■ "Where a biological parent declines to consent to a proposed adoption, the prospective adoptive parent must ordinarily show by clear and convincing evidence that consent is being withheld contrary to the child's best interest." *In re C.L.O.*, 41 A.3d 502, 511 (D.C.2012) (internal quotation marks omitted) (citing, *inter alia,* *Santosky v. Kramer,* 455 U.S. 745, 758, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)); D.C.Code § 16–304(a) and (e) (2001). "In our cases, we have held that a determination as to whether the natural parents are withholding consent contrary to the best interests of the child pursuant to D.C.Code § 16–304(e) requires weighing the factors considered in termination of parental rights proceedings pursuant to D.C.Code § 16–2353(b) (2001)." *In re P.S.*, 797 A.2d 1219, 1223 (D.C.2001) (collecting cases).

The § 16–2353(b) factors applicable here are:

(1) the child's need for continuity of care and caretakers and for timely integration into a stable and permanent home, taking into account the differences in the development and the concept of time of children of different ages;

(2) the physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive consideration being the physical, mental and emotional needs of the child;

(3) the quality of the interaction and interrelationship of the child with his or her parent, siblings, relative, and/or caretakers, including the foster parent; [and]

* * *

(4) to the extent feasible, the child's opinion of his or her own best interests in the matter[.]

D.C.Code § 16–2353(b).

■ "The determination of whether a birth parent's consent to the adoption of a child has been withheld contrary to the child's best interest is confided to the trial court's sound discretion." *In re C.L.O.*, *supra,* 41 A.3d at 510 (internal quotation marks and citation omitted). We therefore review "[a] trial court's weighing of these factors in determining the best interests of the child ... for abuse of discretion," *In re P.S.*, *supra,* 797 A.2d at 1224, "determining whether the trial court exercised its discretion within the range of possible alternatives, based on all the relevant factors and no improper factors." *In re C.L.O.*, *supra,* 41 A.3d at 510 (internal quotation marks and citation omitted). "In so doing, we ... evaluate whether its decision is supported by substantial reasoning drawn from a firm factual foundation in the record." *Id.* (internal quotations marks and citations omitted). We defer to the facts found by the trial court in the absence of clear error. *Application of L.L.,* 653 A.2d 873, 880 (D.C.1995); *see* D.C.Code § 17–305(a) (2001). And we acknowledge that, "as an appellate court, we may not 'redetermine the credibility of witnesses where, as here, the trial court had the opportunity to observe their demeanor and form a conclusion.'" *In re P.S., supra,* 797 A.2d at 1224 (quoting *In re E.H.,* 718 A.2d 162, 169 (D.C.1998)).

On appeal, appellant disputes virtually none of the factual findings underlying the court's conclusion that he withheld his consent contrary to the child's best interests. To the limited extent that the father does challenge the court's findings of fact and credibility determinations,[3] we discern no

---

**3.** For example, appellant argues in his brief that the trial court "abused its discretion" by

failing to draw reasonable inferences from several "highly significant" facts (Br. for Ap-

clear error in the facts as found by the trial court, *see Application of L.L., supra,* 653 A.2d at 880; D.C.Code § 17–305(a), nor do we venture to "redetermine the credibility of [the] witnesses" who appeared before the trial court. *In re P.S., supra,* 797 A.2d at 1224 (internal quotation marks and citation omitted).

Appellant primarily challenges the court's legal conclusions, which, he asserts, are not supported by clear and convincing evidence "because an analysis of the best interest factors ... reveals that [the] adoption brought no benefit to the child whatsoever" (Br. for Appellant at 16). We turn now to the applicable statutory criteria, beginning with the first of the four applicable factors.

*(1) The child's need for continuity of care and caretakers and for timely integration into a stable and permanent home, taking into account the differences in the development and the concept of time of children of different ages.*

■ Appellant argues that "whether or not the adoption was granted, he would always have a stable and permanent home with his mother[,] [and] [t]hus, there was no benefit obtained through adoption under the first factor" (Br. for Appellant at 17). Appellant evidently overlooks the child's need for "continuity of care," as well as his own inability to contribute positively to the "stability" and "permanence" of the child's home. *See In re C.L.O., supra,* 41 A.3d at 513 (footnote omitted).

Record evidence supports the trial court's findings that J.C.F. and H.A.Z. provide a stable and loving home for the child, that J.C.F. has acted as the child's father since S.L.Z. was 17 months old, and that the child, who was three-and-a-half

years old as of the time that the trial court entered its order waiving J.A.C.'s consent, calls J.C.F. "daddy." Indeed, several witnesses whom the trial court found credible testified to the loving relationship between J.C.F. and S.L.Z. Further, the court found that J.C.F. and his family have been financially and emotionally supportive towards the child and visit with the child on a consistent basis. The record evidence also supports, in turn, the trial judge's finding that J.A.C. has proven unable to provide stability and permanence throughout S.L.Z.'s life. As the trial court noted, prior to the issuance of court orders preventing the father from visiting, the father's visits were sporadic and involved violence towards the mother. And following the court orders preventing visitation by the father, nothing prevented the father from providing child support, gifts, or sending cards. We conclude that the trial judge did not err in finding by clear and convincing evidence that this factor should be weighed in favor of adoption.

*(2) The physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive consideration being the physical, mental and emotional needs of the child.*

■ In applying this factor, the trial court properly considered whether breaking S.L.Z.'s secure attachment to J.C.F. and the mother would have a negative impact on S.L.Z. and also considered J.A.C.'s emotional maturity, parenting skills, and ability to meet the emotional needs of the child. *See, e.g., In re C.L.O., supra,* 41 A.3d at 513; *In re C.A.B.,* 4 A.3d 890, 902 (D.C.2010).

Here, the trial court concluded that

pellant at 22–27). However, his arguments, at bottom, amount to assertions that the trial court drew incorrect inferences from the facts

and impermissibly credited the mother's testimony over his own testimony.

[t]he evidence is uncontroverted that the father is unstable and incapable of caring for the child and that [p]etitioners have done a stellar job of rearing the child. Evidence indicates that J.A.C. cannot adequately parent the child nor does it appear that there is a viable method of keeping the child safe while in his care considering his addiction and his total absence of honesty.

The record evidence on which the trial court relied to make this conclusion was plentiful, and included the following: the father's unmet mental health needs, including a diagnosis for major depressive and anxiety disorder and impulse control disorder; his compulsive dishonesty and domestic violence issues; his ongoing gambling addiction; his lack of insight into his issues and his casting blame on others or providing excuses for his dishonest behavior; his history of instability and unpredictability, as evinced by his abuse of the mother, which prevented him from caring for the child; and his recent criminal history, which includes charges and/or incarceration for a number of situations including assault of the mother, theft, larceny, and failure to pay child support. These facts are supported by the record and, taken together, support the trial court's conclusion that S.L.Z.'s physical, mental, and emotional needs would be better met by remaining in the step-father's and mother's custody.

*(3) The quality of the interaction and interrelationship of the child with his or her parent, siblings, relative, and/or caretakers, including the foster parent.*

■ Appellant asserts that there was no benefit obtained by S.L.Z. through the adoption under the third factor because "all parties testified that they loved the child and would do what they could, in their respective capacities, to promote what was best for the child" and further,

because "[p]etitioners testified that the quality of their interaction with S.L.Z. would remain the same, whether or not adoption was granted" (Br. for Appellant at 18). To put it lightly, appellant glosses over the poor quality of his own interactions and relationship with the child while understating the outstanding qualities of the relationship between the child, the step-father, and the mother.

As the trial judge noted, the quality of the relationship between the father and the child is poor, as the father chose gambling over the child's needs, lied about the child's medical insurance coverage, visited sporadically and without notice, and, while visiting, was not attentive. These facts, the trial judge found, belie a real father-son relationship, notwithstanding pictures introduced as evidence of some happy moments during the child's first year of life. Indeed, having found the father unfit, the court granted full physical and legal custody to the mother after the divorce and extended a civil protection order barring the father from visiting the child. The father has been incarcerated, has continued gambling, has paid little child support, and has not written to his son nor sent pictures, gifts, cards or anything to remind the child that he is the father. In contrast, the trial judge found that H.A.Z. has been the one constant loving person in S.L.Z.'s life until she met J.C.F., who became a second source of constant love and support and who will continue to be a wonderful father and stable force in the child's life. We discern no error in the trial court's conclusion that this factor weighed in favor of adoption.

*(4) To the extent feasible, the child's opinion of his or her own best interests in the matter.*

■ The trial court found that, although the child is too young to express his wishes

(at the time of trial, S.L.Z. was only about three-and-a-half years old), the child calls the step-father "daddy" and the testimony adduced at trial shows that the child is attached to J.C.F. The court further noted that the child has had little contact with his father and the mother has cared for the child since birth. The court could only assume that if given the choice the child would express his wishes to remain with the mother and step-father. We conclude that the trial court did not abuse its discretion in ascertaining S.L.Z.'s wishes from the evidence presented, and finding that this factor weighed in favor of waiving the father's consent to the adoption.

Lastly, we note appellant's assertion that the adoption was not required to preserve S.L.Z.'s placement with his mother and step-father because the mother already had sole legal and physical custody pursuant to a custody order. While this argument, perhaps if considered in isolation, might appear minimally persuasive, it loses all cogency when placed in context; as the trial court noted:

> [g]iven that the father has not been significantly involved in the child's life since birth, the history of domestic violence, and the [c]ourt's concern about J.A.C.'s gambling addiction even in light of his short term treatment, the [c]ourt disagrees that an arrangement where H.A.Z. and J.A.C. must coordinate visitation and co-parent is in the child's best interests.

We agree.[4]

### III.

After considering each of the applicable factors under D.C.Code § 16–2353(b), the trial court concluded that clear and convincing evidence required waiver of the father's consent. In reviewing the trial court's decision, we have "evaluated whether its decision is supported by substantial reasoning drawn from a firm factual foundation in the record." *In re C.L.O., supra,* 41 A.3d at 510. We conclude that the court did not abuse its discretion in ruling that J.A.C. withheld his consent to the adoption contrary to the child's best interest, and thus in entering a final decree granting the adoption of S.L.Z. by co-appellees J.C.F. and H.A.Z.

Accordingly, for the foregoing reasons, the order waiving J.A.C.'s consent to the adoption and the final decree granting the adoption are hereby

*Affirmed.*

---

4. Although appellant also raises the question whether the trial court erred in concluding that J.A.C. failed to grasp his opportunity interest, we need not reach this issue in light of our conclusion that the trial court's waiver of J.A.C.'s consent was supported by clear and convincing evidence. *See In re C.L.O., supra,* 41 A.3d at 510 (declining to address issue whether father failed to grasp his opportunity interest where "even if [the father] did grasp his opportunity interest, the court-imposed waiver of his consent to the adoption was supported by clear and convincing evidence").